**Rebecca VOGT, Appellant,**

v.

**Kirby WARNOCK, Independent Executor of the Estate of Barton H. Warnock, Appellee.**

No. 08–01–00108–CV.

Court of Appeals of Texas, El Paso.

May 22, 2003.

Rehearing Overruled June 25, 2003.

L. Shane Stokes, Lynch, Chappell & Alsup, Midland, for appellant.

Dennis A. Fuller, Dallas, for appellee.

Before Panel No. 3 BARAJAS, C.J., LARSEN, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

This case involves lifetime gifts of real property and liquid assets from Barton Warnock, an elderly man, to Rebecca Vogt, a younger woman. It presents this issue: Does execution of a power of attorney in favor of a person who has never acted under its authority create a fiduciary relationship as a matter of law? We conclude that the answer is yes, and the trial court properly charged the jury accordingly. Nevertheless, we find Vogt established the fairness of gifts to her from Dr. Warnock as a matter of law. We therefore reverse and render.

### Facts

Barton Warnock was a professor of biology at Sul Ross University in Alpine, Texas. He was very prominent in his field, and many people sought his advice in his areas of expertise. Rebecca Vogt is an anthropologist and artist specializing in archaic basket making and weaving. Warnock and Vogt first met in 1994 when Vogt sought him out to identify certain plants she was using in her projects. At that time, their mutual friend Mary Ellen Kimball introduced Vogt to both Barton Warnock and his wife Ruel, who had been married for over 60 years. The Warnocks had a son, Tony Warnock, who was 57 years old at the time of trial.

Vogt and Dr. Warnock collaborated on several projects over the next few years, and their friendship grew despite their forty-year age difference. In 1996, Ruel Warnock died and Rebecca Vogt went through a divorce. After filing for divorce in Austin, Vogt began spending more time in Alpine where she stayed in a triplex unit owned by Dr. Warnock and his son Tony. Vogt began teaching courses at Sul Ross University. Vogt and Dr. Warnock spent a good deal of time together, and their

friendship became a romance. In June 1997, Warnock proposed to Vogt. He had made plans for a surprise wedding, but they delayed marriage at Vogt's suggestion.

In December 1997, Dr. Warnock named Vogt his attorney-in-fact under a statutory durable power of attorney and a durable power of attorney for health care. Vogt never acted under these documents, but she knew that Warnock had so designated her. The statutory durable power of attorney contained this paragraph:

> THE ATTORNEY IN FACT OR AGENT, BY ACCEPTING OR ACTING UNDER THIS APPOINTMENT, ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT.

Warnock also employed Vogt under a written contract:

> [F]or the remainder of Dr. Warnock's lifetime, to manage his daily affairs, personal financial and health, and to assist him with and/or co-author profession publications.
>
> . . .
>
> The parties intend that, as Rebecca Vogt's management of Dr. Warnock's care will last during the whole of his lifetime, her monthly income from him should, similarly, last for the whole of his lifetime.

In exchange for undertaking these responsibilities, Warnock paid Vogt $3,000 per month; she received all rights, including royalties, to works published by Warnock, all rights to author or approve any biographical work concerning Warnock, and she was given all items (slides, collections, photos, etc.) generated by Warnock in his professional capacity.

In early 1998, Dr. Warnock revoked a living trust he and Ruel Warnock had created in favor of their son Tony. He transferred ownership of four real properties to Vogt, retaining life estates for himself. Additionally, he named Vogt beneficiary of his brokerage account and his veteran's life insurance policy.

During this time, Warnock and Vogt continued their relationship and intended to marry, although their families disapproved. They continued working on projects together, including a book Dr. Warnock had been writing for years. In February 1998, Warnock prepared a handwritten codicil to his 1994 will, leaving his furniture, household goods, jewelry and personal effects to Vogt, while making a number of specific bequests of a sentimental nature to Tony.

Monty Kimball, an attorney in Alpine and old friend of Dr. Warnock's, assisted in making these changes to Warnock's estate plan. Kimball considered Vogt to be his client, but characterized it as a hybrid transaction in which both parties wanted the same outcome. Kimball consulted numerous times with Warnock, sometimes with Vogt present and sometimes with Warnock alone, to insure that Dr. Warnock understood and desired these transfers. The title company agent also met with Dr. Warnock for the same reason.

Kimball held a taped session with Warnock in which they discussed the transfers, which was introduced at trial and in which this exchange occurred:

> WARNOCK: He [Tony] kind of is piggish. He kind of wants everything, I guess. But I can't see any reason why I couldn't have her [Vogt] to have what I've got, all of it.
>
> KIMBALL: There's no reason whatsoever that you can't dispose of your property the way you want to.
>
> WARNOCK: Well, that's—
>
> KIMBALL: You can do that. The keys to it are—to be effective and to head off

future fights, is that it is made to be very clear you know what you're doing, and this is what you want to do. Because if Tony's ever going to attack it, the way he's got to attack it is by saying that you were taken advantage of, undue influence, those kinds of things.

WARNOCK: Yeah. But that's a lot of malarkey. It's not true.

KIMBALL: Well, I understand that, Doctor, or I wouldn't be participating. I can tell you that.

WARNOCK: Yeah.

KIMBALL: You and I have been friends for a long time. And I wouldn't be participating in this if I thought Rebecca was taking any undue influence over you.

WARNOCK: She certainly is not.

Warnock's physician signed a statement opining that Dr. Warnock was competent to make these decisions.

In December 1997, Barton Warnock was involved in a car fire. He went to his doctor on December 28 and 29, 1997, complaining of vomiting, stooling his pants, weakness, cough, and memory loss. His doctor diagnosed interaction of medications with carbon monoxide exposure from the car fire. In June 1998, at age 86, Barton Warnock was driving alone on a desert road near Alpine. He died in a single-car accident.

Dr. Warnock's will designated Tony Warnock his executor. Tony declined to serve, and his cousin Kirby Warnock agreed to perform the duties of executor instead. In that capacity, he filed suit against Rebecca Vogt alleging fraud and undue influence. During trial, the estate amended its pleadings and dropped all claims except one for breach of fiduciary duty. The estate stipulated that Dr. Warnock had done what he wanted to do in transferring property, and his competency

and undue influence were no longer questions that would be submitted to the jury. The jury failed to find that transfers of two real properties, "the big house" and "the triplex" were fair to Dr. Warnock. It found that transfers of "the white house," "the Fort Stockton property," and transfers of stocks, bonds, personal property, cash and funds on deposit were all fair to Dr. Warnock. The trial court entered judgment accordingly. Rebecca Vogt appeals.

### Standard of review

■ We review the trial court's conclusions of law *de novo*. *Piazza v. City of Granger*, 909 S.W.2d 529, 532 (Tex.App.-Austin 1995, no writ). In reviewing a challenge to a jury finding upon which the challenging party bore the burden of proof, we first examine the record for evidence that supports the finding, ignoring any evidence to the contrary; and, if there is no evidence to support the finding, we must then examine the entire record to determine if a contrary proposition is established as a matter of law. *Raw Hide Oil & Gas v. Maxus Exploration Co.*, 766 S.W.2d 264, 276 (Tex.App.-Amarillo 1988, writ denied).

### Fiduciary relationship established as a matter of law under power of attorney

In her first and second issues on appeal, Vogt urges that the trial court erred in: (1) ruling that, as a matter of law, Rebecca Vogt was a fiduciary, thus shifting the burden of proof to her to prove that the property transfers were fair; and (2) refusing to submit a jury issue on the existence of a fiduciary relationship. We will consider these related issues together.

There is no dispute that Vogt possessed Warnock's power of attorney, and any actions she undertook in that capacity would

certainly be those of a fiduciary. She argues, however, that because she never acted under the power of attorney, she did not become Warnock's fiduciary as a matter of law, and that the issue of whether she was Warnock's fiduciary by virtue of a confidential relationship should have been submitted to the jury. Finding that the trial court properly found the power of attorney conclusively established the fiduciary relationship, we disagree.

The trial court here found that Vogt owed Warnock a fiduciary duty based solely on the power of attorney. This finding placed the burden on Vogt to prove the transfer of his property to her was fair. The trial court made the following findings regarding the fiduciary status:

> The Court: All right. The Court has found that she did not use this document as a power to execute these transfers. But she was given this document on this date that we found, October the—
>
> Mr. Fuller: December the 30th of '97.
>
> The Court: December the 30th. And as a result of her receipt of that document, and the relationship of the parties, the Court has found as a matter of law that a—that a fiduciary relationship existed.

As a result of this legal conclusion, the trial court concluded that Vogt bore the burden of establishing the fairness of transactions between Dr. Warnock and herself, and submitted the following questions to the jury regarding lifetime transfers:

> Do you find from a preponderance of the evidence that the real estate transfers from Barton H. Warnock to Rebecca Vogt were fair to Barton H. Warnock?
>
> In answering this question, you are instructed that by the term "fair" is meant transactions characterized by frankness, honesty, impartiality or candor; open, upright, reasonable, free from suspicion

or bias; equitable, just; affording no undue advantage.

> Answer: Yes or No for each property:
>
> | | |
> |---|---|
> | The Big House | No |
> | The White House | Yes |
> | The Triplex | No |
> | The Fort Stockton Property | Yes |
>
> . . .
>
> Do you find from a preponderance of the evidence that the transactions involving the transfer of stocks, bonds, personal property, cash, and funds on deposit from Barton H. Warnock to Rebecca Vogt were fair to Barton H. Warnock?
>
> . . .
>
> Answer: Yes or No.
>
> Answer: Yes

We begin our analysis by noting that a power of attorney creates an agency relationship, which is a fiduciary relationship as a matter of law. *Plummer v. Estate of Plummer*, 51 S.W.3d 840, 842 (Tex.App.-Texarkana 2001, pet. denied); *Sassen v. Tanglegrove Townhouse Condominium Ass'n*, 877 S.W.2d 489, 492 (Tex. App.-Texarkana 1994, writ denied). A fiduciary owes her principal a high duty of good faith, fair dealing, honest performance, and strict accountability. *Sassen*, 877 S.W.2d at 492. In discussing the nature of fiduciary relationships, our Supreme Court has stated that the higher standards there imposed should rarely be subject to exceptions:

> When persons enter into fiduciary relations each consents, as a matter of law, to have his conduct towards the other measured by the standard of the finer loyalties exacted by courts of equity. That is a sound rule and should not be whittled down by exceptions. If the existence of strained relations should be suffered to work an exception, then a designing fiduciary could easily bring about such relations to set the stage for

a sharp bargain. *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 508 (Tex.1980) (citing *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 788 (1938)).

The court also observed that the fiduciary relationship did no more than cast upon the profiting fiduciary the burden of showing the fairness of the transactions. *Id.* at 509. By accepting both the role of fiduciary and gifts from the principal, the agent consents to have her conduct measured by a higher standard of loyalty. *Id.*

In contrast, Vogt argues that in order for a fiduciary relationship to exist as a matter of law, she would have had to have used the power of attorney in some way. In support of her position, Vogt chiefly relies upon two cases: *Peckham v. Johnson*, 98 S.W.2d 408, 416 (Tex.Civ.App.-Fort Worth 1936), *aff'd*, 132 Tex. 148, 120 S.W.2d 786 (1938) and *Silling v. Erwin*, 885 F.Supp. 881 (S.D.W.Va.1995), *aff'd*, 83 F.3d 416 (4th Cir.1996). We do not find these cases controlling; indeed, the Supreme Court's *Peckham* opinion supports the trial court's determination that a fiduciary duty existed as a matter of law.

*Peckham* dealt with partners who jointly owned several oil leases, one alleging that the managing partner had violated his fiduciary duty to disclose all relevant facts regarding sale of the leases, and thus induced the sale of the non-managing partner's interest for far less than their value, to the managing partner's profit. *Peckham*, 98 S.W.2d at 411. The trial court held the managing partner was the other's fiduciary, and so instructed the jury. The court of appeals reversed, holding that the contract at issue was not entered "with the same confidential relations existing between them as that fixed by law, but that they dealt with each other as man to man and at arm's length, each relying upon his own judgment as to the existing facts."

*Id.* The court wrote that it had become a jury issue whether the partners were dealing at arms length at the time the disputed sales took place because the usual presumption, that partners owed one another the utmost good faith and strictest confidence, was overcome where:

> [U]nder proper pleading and by competent evidence it is made to appear that although certain persons were partners in a business enterprise their dealings with each other for a period of time sufficient to affect their rights had not been that of normal partners, but that their relations were strained, showing evidences of mistrust and known lack of fair dealings. *Id.* at 413.

The Supreme Court, however, disagreed with the court of appeals, finding that the partnership imposed a fiduciary duty as a matter of law. It quoted Justice Cardozo in holding:

> Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Peckham*, 120 S.W.2d at 788 (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928)).

Thus, although Vogt cites the court of appeals *Peckham* opinion in support of its assertion that fiduciary relationships may present a fact question, the higher court's opinion steers us toward a stringent standard undiluted by exceptions, as was adopted by the trial court here.

We next turn to *Silling*, 885 F.Supp. at 891–92. *Silling* is indeed on point: it concerned lifetime gifts and a codicil giving certain property to the decedent's business partner, who also possessed decedent's

power of attorney. In granting a summary judgment for defendant fiduciary, applying West Virginia law, the U.S. district court found that the facts did not justify shifting the burden of proof to the fiduciary to prove undue influence, instead applying the general rule placing the burden on the son who challenged the will to prove fraud. The court found the following factors significant: (1) the partner was not draftsman of the disputed codicil; (2) decedent clearly had mental capacity and competent legal advice; (3) decedent's desire, expressed to disinterested parties, was to make testamentary gifts to his partner; and (4) West Virginia law imposed a clear and convincing evidence standard on the party challenging the will to shift the burden. We hesitate to apply the same holding here, for the following reasons. First, the standard for shifting the burden of proof to the fiduciary is lower in Texas; here the usual preponderance of the evidence standard applies in shifting the burden to the fiduciary to prove fairness. Second, *Silling* concerns a claim of undue influence, rather than breach of fiduciary duty, and may be distinguished on that point. Third, *Silling* is an opinion from the federal district court of West Virginia, and may be persuasive but has no power to bind this Court. We respectfully decline to apply it to the case before us.

◼ In conclusion, we think public policy mandates a finding that Vogt was Warnock's fiduciary. Once a fiduciary relationship is established, we believe the courts are well advised to hesitate in finding exceptions to that high standard of fair dealing and mutual trust it imposes. *Moore*, 595 S.W.2d at 508. The less opportunity the law provides for a "sharp bargain" by a fiduciary, the more secure a vulnerable principal will be, and that is the very essence of fiduciary law. Moreover,

we find it worth repeating that fiduciary status does not prohibit the beneficiary from giving the fiduciary gifts or bequests; instead, it insures that the fiduciary will be prepared to prove the transaction was conducted with scrupulous fairness. Surely this is no more than the law should require. Vogt's first and second issues on appeal are overruled.

### The jury could not reasonably conclude certain gifts were unfair to Barton Warnock

In her third and fourth issues, Vogt claims there is no evidence to support the jury's finding of a breach of the fiduciary duty, and that the preponderance of the evidence demonstrated the transaction was fair to Barton Warnock. We will consider first her legal sufficiency challenge.

◼ First, we note that although Vogt's third issue claims there was no evidence to support the finding that her fiduciary duty was breached, because we have found that the trial court properly placed the burden on her to prove fairness, she must actually demonstrate on appeal that she established fairness as a matter of law. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). A complaint by the party with the burden of proof that there was no evidence to support the jury's finding invokes appellate jurisdiction to consider the contention that the opposite of the finding was established as a matter of law. *Id.* In reviewing the evidence before the jury, we conclude that she did so.

◼ We must first review the record for any evidence that supports the jury's finding. *Raw Hide Oil & Gas*, 766 S.W.2d at 276. In responding to this the Warnock estate makes much of Dr. Warnock's physical and mental problems following the car fire. It is true that the medical records of December 1997 state that Warnock was concerned with memory loss and stooling

his pants, wondering if this could be caused by medications. This notation, however, occurs one day after Warnock's emergency admission to the hospital for weakness and vomiting stemming from inhaling fumes from a car fire. Two weeks before his death, there is an unexplained notation of "dementia" that does not appear to be in the doctor's handwriting. Those are the only indications of any mental difficulties experienced by Warnock; in January and February 1998, the records indicate he presented as "happy and alert." Beyond the medical records, the estate simply points to the employment agreement, power of attorney, and the gifts themselves as evidence of unfairness. There is simply nothing to indicate, however, that these transactions were not only voluntary on Dr. Warnock's part, they were his idea. We find no other evidence in this record supporting a finding that Dr. Warnock did not understand his actions, was acting under any undue influence, or that Vogt was exerting pressure on him to give her valuable gifts. We do not think that the gifts themselves, particularly in light of the life estate that Warnock retained for himself, are evidence of unfairness to him.

Importantly, the estate stipulated Dr. Warnock was doing what he wanted to do in transferring the majority of his estate to Vogt. Its stipulation reads:

> So that the Jury will understand, Plaintiff has filed a trial amendment to its pleadings this morning and we are no longer contending that Barton Warnock did not do what he wanted to do. Further, his competency and the issue of undue influence are no longer questions that will be submitted to the jury.

Further, there is evidence that Dr. Warnock's primary physician's signed an affidavit stating that Dr. Warnock was able to perform the transfers and understood the consequences of his actions. Dr. Warnock's interview with Monty Kimball and Mr. Kimball's testimony to the jury show that Warnock wanted to give these valuable gifts to his fiancée. He kept a life estate in all the real property transfers, thus the transfers deprived him of nothing during his lifetime. According to friends and family, Warnock was an independent, strong-willed man who was not easily influenced. Tony Warnock had weekly conversations with his father throughout 1997 and 1998, and nothing in those conversations indicated Barton Warnock was having any trouble making business decisions.

Moreover, we find no explanation for the jury's decision that transfers of the big house and the triplex were unfair to Dr. Warnock, but the transfers of the white house, the Fort Stockton property, and the stocks, bonds, cash, and personal property were fair. The transfers were made during the same time period, to the same person, Dr. Warnock retained lifetime title to the real property and transferred the personal property only upon his death. Perhaps the jury confused fairness to Dr. Warnock with fairness to his son and late wife. That was not an issue the jury was authorized to decide, however.

It is uncontroverted that Dr. Warnock did what he wanted to do in transferring his property to Rebecca Vogt, that he was competent at the time the transfers were made, and that she did not exercise undue influence upon him to accomplish the transfer here. This Court concludes the evidence established fairness as a matter of law. Vogt's third issue on appeal is sustained. We therefore need not reach her fourth issue.

### Conclusion

The judgment of the trial court is reversed and rendered insofar as it voids the transfers from Dr. Barton Warnock to Re-

becca Vogt of the two pieces of real property located in Alpine Texas; the first at 307 and 309 E. Lockhart and 401 Second Street, the second at 702 E. Lockhart, described in detail at page two of the trial court's final judgment. In all other respects, the trial court's judgment is affirmed.