In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00203-CV
_____

**LAURA KATHLEEN FIELDING, ADMINISTRATOR
OF THE ESTATE OF CHARLES W. HODGE, Appellant**

**V.**

**JANNIECE TULLOS, Appellee**

**On Appeal from the 260th District Court
Orange County, Texas
Trial Cause No. D160234-C**

**MEMORANDUM OPINION**

Appellant Laura Kathleen Fielding, Independent Administrator of the Estate

of Charles W. Hodge, Deceased, ("the Estate," "Plaintiff," or "Appellant") filed the

underlying suit to set aside certain beneficiary designations made by Charles Hodge

("Charles"). Before his death, Charles named his caretaker, Appellee Janniece

Tullos ("Tullos," "Defendant," or "Appellee"), as the beneficiary of two of his

1

accounts located at UBS Financial Services Inc. The trial court granted a summary judgment in favor of Tullos, from which the Estate appeals. We affirm.

Background

Charles died on December 22, 2014. His wife predeceased him. Charles and his wife had no children. Charles's Last Will and Testament executed in November 2004 was filed for probate, and the Judgment Declaring Heirship named six heirs—all nieces and nephews—each with a one-sixth share in Hodge's estate: Laura Kathleen Fielding, Renee Pomonis, Lori Park, Joe David Hodge, Gary Hodge, and George Bishop. The probate court named Fielding as the administrator of Charles's estate.

Tullos worked as a caretaker for Charles and his wife, O.V. Tullos began working for O.V. in August 1997, and she continued working for Charles after O.V.'s death in 2004. Charles needed assistance at home because of mobility limitations and a history of many surgeries. While working for O.V., Tullos was at the house four days a week, but after O.V. died, Tullos was usually at Charles's house seven days a week.

On November 30, 2004, Charles executed an Account Application and Agreement for Individuals and Custodial Accounts ("Account Application") for his Retail Management Account ("the RMA account") with UBS Financial Services Inc.

2

("UBS"). On that same day, Charles also executed an IRA Beneficiary Designation Update Form for an IRA account with UBS ("the IRA account"). In the IRA Beneficiary Designation Update Form, Charles named his sister, Shirley Wood, as primary beneficiary, and Charles named E.J. Wood, Charles's brother-in-law, and Tullos as 50% contingent beneficiaries. On May 18, 2011, Charles executed another IRA Beneficiary Designation Update Form for the IRA account, in which Charles named Tullos primary beneficiary and Shirley Wood as contingent beneficiary. Also on May 18, 2011, Charles executed a Transfer on Death Agreement for the RMA account in which Charles named Tullos as the sole beneficiary.

Plaintiff's Original Petition

On August 4, 2016, Fielding, as Independent Administrator of Charles's estate, filed a verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Tullos. Plaintiff alleged that at the time of his death, Charles had about $1,699,000 in his UBS accounts. Plaintiff sought a judgment declaring that all financial accounts, including the two UBS accounts, are "properly payable" to Charles's estate or that all changes to Charles's financial accounts, including the UBS accounts, "are void and all such funds and assets are properly payable" to Charles's estate. Plaintiff alleged that Charles lacked capacity to make any transactions, to change beneficiary designations, or to enter into a

3

contract. Plaintiff also alleged that any transactions, beneficiary designations, or changes in beneficiary designations to Charles's accounts were executed as the result of undue influence. Plaintiff asserted a claim for tortious interference with inheritance rights and unjust enrichment. Plaintiff also alleged that there should be a deferral of the accrual of limitations, and that the suit was filed within four years of Plaintiff's knowledge of facts that would lead a reasonably prudent person to discover Defendant's wrongful acts.

Plaintiff also requested a temporary restraining order and a temporary injunction to prevent Tullos from transferring or disposing of funds and assets that are the subject of the litigation, and from destroying or altering communications.

Defendant's Objections, Motion to Strike, and Answer

Tullos objected to the application for a TRO and temporary injunction and filed a motion to strike. Defendant alleged that Plaintiff's petition did not include specific facts showing immediate irreparable harm, and that Plaintiff failed to allege facts supporting the claim that Tullos would deplete the accounts or supporting Plaintiff's claims of undue influence, tortious interference with inheritance rights, or unjust enrichment. Defendant moved to strike Plaintiff's pleadings seeking a declaratory judgment, arguing that a declaratory judgment cannot be used to decide tort liability and that there was no claim or proof that the beneficiary designations

4

are unclear, ambiguous, or not what they purport to be. Defendant also alleged that Plaintiff is not entitled to attorney's fees.

Defendant filed an Original Answer which included a general denial, an objection to Plaintiff's request for a TRO and temporary injunction, and special exceptions. Defendant also demanded a jury trial.

Plaintiff's Amended Original Petition

Plaintiff filed a First Amended Original Petition ("Amended Petition"). Plaintiff alleged that a formal or informal fiduciary relationship existed between Charles and Tullos and that the fiduciary relationship "gives rise to a presumption of undue influence that shifts the burden of proof" on undue influence to Tullos. Plaintiff alleged that Tullos used her position as caretaker and fiduciary to manipulate Charles for her own financial gain and that, but for Tullos's undue influence, Charles would not have named Tullos as beneficiary of his accounts. Plaintiff argued that the "Deferral of Accrual of Limitations Doctrine" applied, and she sought a declaratory judgment, alleged that Tullos had been unjustly enriched, and sought damages, costs, and attorney's fees.

Defendant's Answer to the Amended Petition

The Defendant filed an answer to the amended petition. The Defendant asserted a general denial, denied that there was any "undue influence," denied the

5

existence of either a formal or informal fiduciary relationship, and asserted several affirmative defenses. The defendant alleged that Plaintiff's claims are barred by the statute of limitations, that Charles intended to transfer the funds on his death to Tullos as a gift, that Plaintiff has unclean hands, and that Plaintiff's claims are barred by ratification. The Defendant also included special exceptions. The Defendant alleged that Plaintiff failed to state what breach of fiduciary duty by the Defendant caused injury to the Plaintiff, Plaintiff failed to state facts to support a claim of undue influence, and Plaintiff is not entitled to a declaratory judgment or attorney's fees and costs. And the Defendant asserted a counterclaim for attorney's fees and costs.

Defendant's First Motion for Summary Judgment

The Defendant filed her first motion for summary judgment on March 10, 2017. The Defendant argued that Plaintiff's claims for undue influence and unjust enrichment are barred by the statute of limitations because Plaintiff's complaints pertain to beneficiary designations executed in 2004 and 2011, and the alleged injury that is the basis of the lawsuit is not inherently undiscoverable. The Defendant argued that the evidence demonstrates Tullos did not exert undue influence over Charles. Tullos argued that Charles had made it clear to his financial advisors that he intended to leave Tullos the funds in his UBS accounts, Tullos cared for Charles daily for ten years, Charles had "no relationship" with three of his nieces and

6

nephews and only a limited relationship with the others, and none of the nieces or nephews had helped care for Charles. According to Tullos, Fielding admitted in her deposition that she did not have personal knowledge to support the claim of undue influence and Fielding could not provide any examples of how Tullos exerted undue influence over Charles. Citing deposition testimony of Tullos, and also of Gretchen Hargroder and Richard Ridley, two UBS financial advisors, Tullos argued that she was not involved in Charles's finances, she did not review his bank statements and was unaware of the specifics of the UBS accounts, and she was generally uninterested in the UBS accounts, although she drove Charles to UBS so that Charles could transact business.

Defendant's Motion for Summary Judgment on Fiduciary Relationship

The Defendant filed a second motion for summary judgment on March 14, 2017, in which she argued that Plaintiff cannot establish the existence of a fiduciary relationship and there is no evidence that Charles relied on Tullos for any judgment or advice. Defendant argued that there was no transaction between Charles and Tullos, no undue influence exerted by Tullos over Charles, and any presumption of unfairness does not apply. Quoting deposition testimony of Gretchen Hargroder, Tullos argued that Charles was "in charge of his accounts, and he made the decisions on the accounts. [Tullos] had no -- she had no influence or input on those decisions

7

whatsoever." Defendant also argued that, even if a fiduciary relationship existed between Charles and Tullos, the beneficiary designations at issue do not arise from a transaction between Charles and Tullos, and there is no presumption of unfairness and the burden of proof on undue influence would not shift to the Defendant.

Plaintiff's Response to the Motions for Summary Judgment

Plaintiff filed a joint response to both motions for summary judgment. Plaintiff argued that the causes of action for undue influence and unjust enrichment accrued upon Charles's death, or in the alternative, that the deferral of the accrual of limitations doctrine applies, so that Plaintiff's causes of action accrued when Plaintiff learned of Defendant's actions. According to Plaintiff, "[i]t is fundamental that an undue influence cause of action for a beneficiary designation does not accrue until the death of the person [] who was unduly influenced." Plaintiff also argued that undue influence is a type of fraud and that deferral of accrual of limitations applies in causes of action for fraud. Plaintiff argued in the alternative that for a cause of action based on undue influence, the statute of limitations is tolled until the undue influence ceases to exist at the time of Charles's death.

Plaintiff also argued that the summary judgment evidence establishes that a fiduciary relationship existed between Charles and Tullos, which results in a presumption of undue influence, and that the Defendant has the burden of proof to

8

establish that she did not unduly influence Hodge to sign the beneficiary designations. Plaintiff argued that Defendant cannot meet her burden of proof on undue influence and that fact issues exist on undue influence and unjust enrichment.

Plaintiff also argued that the evidence establishes that an informal fiduciary relationship existed between Charles and Tullos because: Tullos was a caretaker for the Hodges for seventeen years, and she was with Charles daily for ten years until his death; Charles trusted and had confidence in Tullos; Tullos wrote out Charles's checks and made all his bank deposits; Tullos added Charles to her cell phone account; Tullos was on Charles's Bank of America, Discover, and Chase Freedom credit card accounts and used these accounts to buy groceries, gasoline, and sundries; and, when Charles was hospitalized, he left Tullos with signed blank checks.

Plaintiff also argued that the evidence establishes the existence of a formal fiduciary relationship between Charles and Tullos. Plaintiff noted that on November 30, 2004, Charles and Tullos signed an "Account Application and Agreement for Individuals and Custodial Accounts" for Charles's RMA account, and that under Tullos's signature the word "agent[]" appears. Plaintiff also noted that on February 14, 2014, Charles executed a Power of Attorney for his UBS accounts naming Tullos as his agent. Citing Tullos's deposition, Plaintiff explained that when Charles signed the Power of Attorney, Charles was in a nursing home recuperating from an incident

9

of cardiac arrest. According to the Plaintiff, the deposition testimony of Hargroder also showed that Hargroder had explained to Tullos that Tullos would be Charles's agent under the Power of Attorney. Citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) and *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942), Plaintiff argued that "Texas law provides that an agent is a formal fiduciary to her principle [sic]."

The Plaintiff also argued that "abundant circumstantial evidence" proves undue influence. Citing *Rothermel v. Duncan*, 369 S.W.2d 917 (Tex. 1963) and *Mackie v. McKenzie*, 900 S.W.2d 445 (Tex. App.—Texarkana 1995, writ denied), Plaintiff argued that "[t]he summary judgment circumstantial evidence supports all of the[] *Rothermel* factors and establishes that Charles W. Hodge was unduly influenced into executing the May 18, 2011 UBS beneficiary designation." According to the Plaintiff, the circumstances surrounding the execution of the beneficiary designations provides evidence that Charles was unduly influenced by Tullos. Plaintiff emphasized that in her deposition testimony, Tullos explained that she drove Charles to UBS on November 30, 2004, when Charles executed the IRA Beneficiary Designation Update Form that named Tullos as a 50% contingent beneficiary, and where Charles and Tullos signed the Account Application for the RMA account. According to the Plaintiff, the execution of the May 18, 2011

10

beneficiary designation for the UBS accounts also demonstrated that Charles executed the change in the car in the UBS parking lot while Tullos was in the car, as explained in the deposition testimony of Hargroder and Ridley.

Plaintiff argued that Tullos worked for Charles seven days a week after his wife died, and Charles spent holidays and celebrated birthdays with Tullos and her family. According to the Plaintiff, the evidence suggested that Tullos "desired the funds" in Charles's UBS accounts because on December 17, 2014, Tullos used her power of attorney to take $20,000 out of Charles's account and put it into her own savings account; and, on January 16, 2015, she took out $348,081.91 from the UBS accounts, she used $30,000 to buy a new car, she gave each of her children $100,000, she bought new furniture, and she paid her property taxes. According to the Plaintiff, Tullos had "unlimited opportunities" to influence Charles because: she was at his home every day of the week, she wrote all of his checks, she made his bank deposits, Charles left her signed blank checks when he was hospitalized, and he celebrated holidays and birthdays with Tullos and her family. Plaintiff also argued that Tullos's own deposition testimony shows that Charles had multiple medical issues and had undergone seventeen major surgeries, rendering him unable to drive and "totally dependent" on Tullos. Finally, Plaintiff argued that Charles's Will provided that if his wife did not survive him, his estate should be divided equally between Shirley

11

and E.J. Wood or their heirs, but "[a]s a result of Defendant's actions, the vast majority of Charles Hodge's assets were not distributed in accordance with his testamentary wishes."

Plaintiff filed an Amended and Supplemental Response to the motions for summary judgment. In addition to re-urging the arguments in Plaintiff's first response, Plaintiff also argued that Charles took numerous medications for many years, some of which have side effects including memory impairment and confusion, and the medications "made him more susceptible to undue influence" by Tullos. Plaintiff argued that Defendant's reliance on the testimony of Richard Ridley and Gretchen Hargroder "is misplaced[]" because when Charles executed the May 18, 2011 beneficiary designation, Ridley and Hargroder had only been acquainted with Charles for a month, and another financial advisor, Sammy Page, had served Charles before April 20, 2011.[1] Plaintiff also alleged that Ridley and Hargroder had only met with Charles once before May 18, 2011.

Defendant's Reply

Defendant filed a reply brief. The Defendant argued that the Plaintiff had "shift[ed] gears" by arguing fraud and fraudulent concealment and that the Plaintiff

---

[1] Plaintiff included no deposition testimony of Sammy Page, and the record does not suggest Page was deposed.

had not pleaded such claims. Defendant also argued that Plaintiff had failed to respond to Defendant's motion for summary judgment on "fiduciary duty," and because there is no evidence that Defendant breached any fiduciary duty, Defendant is entitled to summary judgment on any claim for fiduciary duty. Defendant alleged that Plaintiff's amended petition includes a judicial admission that the complained-of conduct occurred in 2004 and 2011, and that as a matter of law, the limitations period begins to run when the wrongful conduct occurs. Defendant also argued that there is no evidence of any transaction between Charles and Tullos which is necessary to support a claim of breach of fiduciary duty and a presumption of unfairness. Defendant argued that the summary judgment evidence of undue influence is legally insufficient, and that Plaintiff merely presented evidence of the opportunity for influence.

Hearing and Final Judgment

The court held a hearing on the motions for summary judgment. At the hearing, Plaintiff's counsel explained that his client is not asserting a claim for a breach of fiduciary duty, but his client is alleging that a fiduciary duty existed, which means there is a presumption of undue influence. Plaintiff argued that the Plaintiff need only present "some evidence" of a fiduciary relationship and then the burden of proof shifts to Tullos to disprove undue influence, and according to the Plaintiff,

13

the 2004 Account Application document, where Tullos signed as "agent," is some evidence of a fiduciary relationship between Tullos and Charles.

At the end of the hearing, the trial court explained that it was going to grant the motion for summary judgment and stated:

> Well, I have spent a lot of time in reading up on all of your positions. I can't say I've read all of the depositions or whatever, but I've read what has been attached to the motions. And it seems clear to me that there was, as you say, every opportunity for Ms. Tullos to have undue influence on Mr. Hodge. There was every opportunity for that to happen because she was with him basically all day for a number of years, but I don't see any evidence that she did that. Certainly there was evidence she could have, but I don't see any evidence that she did. I don't think there was a fiduciary relationship there where he had complete trust in her. And she did sign some checks and she did do some things for him and he never tried to write a will that named her or whatever.
> So, based upon all I've read and the evidence I've heard, I don't see the fact issue; and I'm going to grant the motion for summary judgment.

On May 4, 2017, the trial court signed a Final Judgment granting Defendant's Motion for Summary Judgment, stating the motion "addressed all of Plaintiff's causes of action and claims for relief[.]" The Final Judgment ordered that Plaintiff take nothing, denied all of Plaintiff's requested relief, and it "dispose[d] of all claims and all parties[.]" Plaintiff timely filed a notice of appeal.

14

## Issues

Appellant raises three issues on appeal. In her first issue, Appellant argues that the trial court erred in granting Appellee's motions for summary judgment because Appellee failed to overcome the presumption of undue influence, failed to prove as a matter of law that she did not unduly influence Charles to sign the beneficiary designation, and failed to prove as a matter of law that Appellee did not have an informal and formal fiduciary relationship with Charles. In her second issue, Appellant argues that there are genuine issues of material fact about whether Appellee unduly influenced Charles and the fact issues preclude summary judgement. Appellant's third issue argues that Appellee's limitation defense is inapplicable as a matter of law.

## Standard of Review

When it is not readily apparent that the movant seeks a summary judgment on no-evidence grounds, "the court should presume that it is filed under the traditional summary judgment rule and analyze it according to those well-recognized standards." *Richard v. Reynolds Metal Co.*, 108 S.W.3d 908, 911 (Tex. App.—Corpus Christi 2003, no pet.) Accordingly, we construe Defendant's Motions for Summary Judgment as asserting traditional grounds for summary judgment. *See* Tex. R. Civ. P. 166a.

15

We conduct a de novo review of an order granting a traditional motion for summary judgment. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We deem as true all evidence that is favorable to the nonmovant, indulge every reasonable inference to be drawn from the evidence, and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When a trial court does not specify the grounds on which it granted the motion for summary judgment, we must affirm if any of the grounds asserted in the motion are meritorious. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

To be entitled to a traditional summary judgment, a movant must establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law on the issues set forth in the motion. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Generally, a defendant needs to conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense to succeed on a traditional motion for summary judgment. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). "Evidence is conclusive only if reasonable people could not differ in their conclusions[.]" *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Once the

16

party moving for summary judgment has established its right to summary judgment as a matter of law, the nonmovant must present evidence raising a genuine issue of material fact to avoid the motion being granted. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979).

On a traditional motion for summary judgment, a nonmovant need not file an answer or response to a motion for summary judgment in order to challenge the sufficiency of the evidence relied on by the movant. *See Fantastic Homes, Inc. v. Combs*, 596 S.W.2d 502, 502 (Tex. 1979) (citing *Clear Creek Basin Auth.*, 589 S.W.2d at 678). We may consider only the grounds expressly set forth in the motion for summary judgment and the issues of fact expressly set forth in the response. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341-43 (Tex. 1993).

Undue Influence, Burden of Proof, and Fiduciary Relationship

The party contesting a will or payable-on-death provision or beneficiary designation based on a claim of undue influence bears the burden of proving undue influence. *Rothermel*, 369 S.W.2d at 922; *Quiroga v. Mannelli*, No. 01-09-00315-CV, 2011 Tex. App. LEXIS 1959, at *12 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.). Undue influence is a form of fraud, and the term describes the wrongful use of influence, such as through force, intimidation, duress, or deception, to cause the execution of a will that is contrary to the testator's desire for

17

the distribution of his or her property after death. *In re Estate of Butts*, 102 S.W.3d 801, 803 (Tex. App.—Beaumont 2003, pet. denied) (majority of the Beaumont Court concluded the trial court properly granted summary judgment as to contestants' claims challenging decedent's will and alleging undue influence). In an undue influence claim, the evidence must show not only the presence of the opportunity to influence, but also that improper influence was exerted on the decedent at the time the beneficiary designation or will was made. *Id*. Simply because the beneficiary had a close relationship with the decedent or otherwise was present for the execution of an instrument, it does not establish proof of undue influence. *See Guthrie v. Suiter*, 934 S.W.2d 820, 832 (Tex. App.—Houston [1st Dist.] 1999, no writ); *Evans v. May*, 923 S.W.2d 712, 715 (Tex. App.—Houston [1st Dist.]1996, writ denied). A person may request or entreat another person to create a favorable dispositive instrument, but unless the entreaties are shown to be so excessive as to subvert the maker's will, they do not constitute undue influence that invalidates the will. *See In re Estate of Kam*, 484 S.W.3d 642, 653 (Tex. App.—El Paso 2016, pet. denied); *In re Estate of Sidransky*, 420 S.W.3d 90, 95 (Tex. App.—El Paso 2012, pet. denied). The contestant must prove the existence and exertion of an influence that subverted or overpowered the testator's mind when the testator executed the document so that the testator executed the document in a manner that he otherwise would not have

18

executed but for such influence. *Rothermel*, 369 S.W.2d at 922; *Long v. Long*, 196 S.W.3d 460, 467 (Tex. App.—Dallas 2006, no pet.).

Plaintiff contends there was either a formal or informal fiduciary relationship between the testator and the beneficiary. Plaintiff argues that the fiduciary relationship also carries a presumption of undue influence, which then shifted the burden of proof onto the Defendant to prove she did not engage in undue influence. *See, e.g.*, *In re Estate of Pilkilton*, No. 05-11-00246-CV, 2013 Tex. App. LEXIS 1080, at *3 (Tex. App.—Dallas Feb. 6, 2013, no pet.) (mem. op.) (citing *Spillman v. Spillman's Estate*, 587 S.W.2d 170, 172 (Tex. Civ. App.—Dallas 1979, writ ref'd n.r.e.); *Price v. Taliaferro*, 254 S.W.2d 157, 163 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.)); *Rounds v. Coleman*, 189 S.W. 1086, 1089 (Tex. Civ. App.—Amarillo 1916, no writ) ("Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted."); *see also Quiroga*, 2011 Tex. App. LEXIS 1959, at **12-13 (explaining that the person challenging the validity of the instrument generally bears the burden of proving elements of undue influence, but noting that "[i]n some cases involving confidential or fiduciary relationships, . . . the burden shifts to the person receiving the benefit to prove the fairness of the transaction").

Fielding had the burden of establishing that a fiduciary relationship existed between Tullos and Charles. *See In re Estate of Coleman*, 360 S.W.3d 606, 611 (Tex. App.—El Paso 2011, no pet.). Once a contestant presents evidence of a fiduciary relationship, a presumption of undue influence may arise and the other party then bears the burden to come forward with evidence to rebut the presumption. *Estate of Pilkilton*, 2013 Tex. App. LEXIS 1080, at *31 (citing *Spillman*, 587 S.W.2d at 172; *Price*, 254 S.W.2d at 163); *see also Quiroga*, 2011 Tex. App. LEXIS 1959, at **12-13.

Such a rebuttable presumption shifts the burden of producing evidence to the party against which it operates. *See Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Long v. Long*, 234 S.W.3d 34, 37 (Tex. App.—El Paso 2007, pet denied); *All Am. Builders, Inc. v. All Am. Siding, Inc.*, 991 S.W.2d 484, 489 (Tex. App.—Fort Worth 1999, no pet.) (citing *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993)). Once evidence contradicting the presumption has been offered, the presumption is extinguished. *Id*. The case then proceeds as if no presumption ever existed. *See Tex. Nat. Res. Conservation Comm'n v. McDill*, 914 S.W.2d 718, 724 (Tex. App.—Austin 1996, no writ). A rebuttable presumption does not shift the ultimate burden

20

of proof. *See Garza v. Mission*, 684 S.W.2d 148, 152 (Tex. App.—Corpus Christi 1984, writ dism'd w.o.j.); *see also Saenz*, 873 S.W.2d at 359.

The Plaintiff acknowledges the Estate did not state a claim for breach of a fiduciary duty, however the Plaintiff argues that a fiduciary relationship existed between Charles and Tullos, the effect of which is to shift the burden of proof onto Tullos to disprove undue influence. Assuming without deciding that Tullos owed Charles a fiduciary duty, it would not shift the ultimate burden of proof in the case to Tullos, but it would invoke the application of a rebuttable presumption. Tullos could rebut the presumption by coming forward with evidence showing the fairness of the transaction. *See Young v. Fawcett*, 376 S.W.3d 209, 216 (Tex. App.—Beaumont 2012, no pet.); *Vogt v. Warnock*, 107 S.W.3d 778, 784 (Tex. App.—El Paso 2003, pet. denied). If Tullos's summary judgment evidence contradicted the presumption, the presumption was extinguished. Plaintiff retained the ultimate burden of proof on her claims. *See Saenz*, 873 S.W.2d at 359.

## Appellant's Argument

Appellant argues that the trial court erred in granting summary judgment in favor of the Appellee because "genuine issues of material facts exist that Appellee unduly influenced Charles Hodge." According to Appellant, "circumstantial summary judgment evidence" supports all the factors outlined in *Rothermel*. *See* 369

21

S.W.2d 917. Appellant argues that considering the evidence in a light most favorable to Appellant, the non-movant, the summary judgment evidence establishes fact issues that preclude summary judgment on the undue influence claim.

Undue Influence

In Texas, the rules guiding a determination of the existence of undue influence apply substantially alike to wills, deeds, and other instruments. *Bradshaw v. Naumann*, 528 S.W.2d 869, 871 (Tex. Civ. App.—Austin 1975, writ dism'd). To set aside an instrument based on undue influence, the party claiming undue influence must prove (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the property owner at the time the instrument was executed; and (3) the execution of an instrument that the property owner would not have executed but for such influence. *See Rothermel*, 369 S.W.2d at 922.

To satisfy the first element, the party contesting an instrument must show that an undue influence existed and was exerted. *Id.* The contesting party focuses on facts showing the opportunities for the exertion of the alleged influence, the circumstances of the drafting and execution of the instrument, the existence of a fraudulent motive, and whether the person executing the instrument was habitually under the control of another. *Id.* at 923. The exertion of influence, however, cannot be inferred from

22

opportunity alone, such as might result from taking care of the property owner or seeing to his needs. *Id.* There must be proof showing both that the influence existed and that it was exerted. *Id.*

To satisfy the second element, the contesting party must show that the exertion of the influence subverted or overpowered the mind of the property owner at the time he signed the instrument. *Id.* at 922. The focus of this element is on the property owner's state of mind and evidence relating to his ability to resist or susceptibility to the influence of another, such as mental or physical infirmity. *Id.* at 923. But evidence that a property owner was susceptible to influence or incapable of resisting it does not prove that his free will was in fact overcome when the instrument or act of the owner was made. *Id.*; *Guthrie*, 934 S.W.2d at 832. Likewise, a close relationship or the fact the other party was a caretaker would not be sufficient to show undue influence. *See, e.g.*, *Guthrie*, 934 S.W.2d at 832; *Evans*, 923 S.W.2d at 715. Influence is "undue" when the property owner's volition is destroyed and the resulting instrument expresses the wishes of the one exerting the influence. *Rothermel*, 369 S.W.2d at 922. Undue influence may include force, intimidation, duress, persistent requests or demands, or deceit. *Id.*

To meet the third element, the contesting party must show that the property owner would not have executed the challenged instrument but for the undue

influence. *Id.* In general, this element focuses on whether the instrument makes an unnatural disposition of property. *Id.* at 923. A disposition may be unnatural, for example, if it excludes a property owner's natural heirs or favors one heir at the expense of others who ordinarily would receive equal treatment. *See Long v. Long*, 125 S.W.2d 1034, 1036 (Tex. 1939). Even so, the disinheritance of close relatives or loved ones is not necessarily unnatural. *See, e.g.*, *Guthrie*, 934 S.W.2d at 832 (exclusion of testator's only living son from will not unnatural given strained and distant relationship between him and his mother). A property owner's preference for one beneficiary over others may be unnatural if the record does not disclose a reasonable basis for the preference or contains proof that calls the preference into question or discredits it. *See Rothermel*, 369 S.W.2d at 923-24; *Curry v. Curry*, 270 S.W.2d 208, 213 (Tex. 1954); *Craycroft v. Crawford*, 285 S.W. 275, 278-79 (Tex. 1926).

The person challenging the validity of an instrument generally bears the burden of proving the elements of undue influence by a preponderance of the evidence. *Evans*, 923 S.W.2d at 715. Undue influence may be established by circumstantial evidence, but such evidence must be probative of the issue and not merely create a surmise or suspicion that such influence existed at the time the document was executed. *Id.*; *Guthrie*, 934 S.W.2d at 831 (citing *Reynolds v. Park*,

24

485 S.W.2d 807, 813 (Tex. Civ. App.—Amarillo 1972, writ ref'd n.r.e.)). Undue influence cannot be inferred by opportunity alone, and there must be some evidence to show that the influence was not only present, but that it was in fact exerted with respect to the execution of the challenged instrument itself. *See In re Estate of Sidransky*, 420 S.W.3d at 96 (citing *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied)).

## Deposition Testimony

In her deposition, Tullos testified that she worked for Charles seven days a week, her duties included cleaning, cooking, driving for Charles, and accompanying him on doctors' appointments, and that Charles had mobility issues that required him to use a cane or walker. Tullos explained that she would write out checks for Charles, and he would sign them, but he reviewed his bank statements himself. Tullos used Charles's credit cards for groceries, gasoline, and at the drugstore, and she had a card tied to Charles's Discover and Chase accounts. Tullos testified that Charles sometimes paid for her income tax preparation, she put Charles on her cell phone account, and she and Charles would alternate paying the cell phone bill. According to Tullos, Charles also spent holidays with her family as well as attended her grandchildren's birthdays.

Tullos agreed that Charles trusted her and had confidence in her. Tullos did not recall whether she was present when the 2004 beneficiary designation was executed. According to Tullos, the first time she knew she was the beneficiary on Charles's UBS accounts was on December 17, 2014. Tullos acknowledged her signature was on the 2004 Account Application form, but she did not know who wrote in "agent" on the form. Tullos agreed that, following Charles Hodge's death, she used about $30,000 from the UBS accounts to buy a new car, gave each of her children $100,000, paid about $4500 for new furniture, and paid her property taxes with the money.

Gretchen Hargroder testified in her deposition that UBS provides training on how to identify vulnerable or incapacitated clients. She explained that she had never seen any indication that Tullos was exerting an improper influence over Charles regarding his business affairs and she did not see any indication that Charles was a "vulnerable client[.]" According to Hargroder, she encouraged Charles to name someone as having his power of attorney when he was in a rehabilitation facility in 2014, and he voluntarily named Tullos in the power of attorney. Hargroder explained that she and Ridley met with Charles about twice a year and that Tullos "was almost always there, but [Tullos] would pretty much excuse herself from the conversations once it turned into a conversation about his accounts."

26

Hargroder regarded Charles as intelligent and informed about investments generally, and she thought that he seemed to understand the nature of his accounts. She also did not regard Charles as lacking mental capacity or to be "heavily medicated" but thought Charles "always appeared . . . to be in charge of his faculties and he didn't appear to be functioning with any dementia or influence[.]" Hargroder explained that, although Charles would sometimes invite Tullos to sit in on meetings, Charles "was in charge of his accounts, and he made the decisions on the accounts. [Tullos] had no . . . influence or input on those decisions whatsoever." Hargroder never observed Tullos telling Charles what to do about his financial accounts, and she explained that Tullos was not curious about the accounts and Tullos did not want to be involved with Charles's finances. Hargroder testified that she recalled Charles saying he would like to help his nephew George Bishop, but Charles did not think giving the nephew money would be helpful because, according to Charles, George had a drug problem.

Hargroder explained:

Q. Okay. So, when we're talking about Account No. [] -- that's the transfer on death agreement -- Mr. Hodge indicated that he wanted Janniece Tullos to be his beneficiary; is that correct?

A. He did.

Q. And did he ever tell you that in person?

27

A. He did.

Q. Did he tell you why he wanted her to be his beneficiary?

A. Because she took care of him and she was there for him and she took him to all his appointments and she -- you know, she was the one who cared for him.

Q. And do you know how long she had cared for him?

A. I know she took care of his late wife, and I think that she took care of him from the time that his wife died.

Q. It was for a number of years; is that right?

A. Yes. Yes, it would have been a number of years.

Richard Ridley testified that he never saw any indication that Charles lacked the mental capacity to understand his UBS accounts. Ridley testified that Charles appeared to have an understanding of investments that was "way above average." Ridley also did not recall ever seeing Charles under the influence of medication. Ridley explained that Charles broached the subject of changing his beneficiary designations in 2011 because E.J. Wood had died and Charles thought Shirley would not live long. According to Ridley, Charles told him "'I do not think my sister is going to last a long time; and I would like you to make Janniece Tullos the beneficiary on both of the accounts.'" Ridley explained that when Tullos drove Charles to the UBS office, Ridley offered to come out to Charles's car with a notary because it might be easier for Charles, and Charles agreed and executed the

documents in the car in front of the notary. Ridley testified that he asked Charles "You know, Charles, between these two accounts, this is a great deal of money, in my opinion. Are you -- are you certain this is what you want to do?," and Charles replied "Yes, it is." Ridley explained:

> I will repeat that I never felt in my dealings with Charles that he was out of control in any manner. He was always levelheaded. Charles was someone who . . . liked to talk about his investments. He enjoyed talking about them. And he was a pretty sharp fellow. . . . I never saw any incapacitation whatsoever, in person or on the phone.

Ridley did not believe that Tullos ever tried to interfere in Ridley's relationship with Charles. Ridley explained that he reviewed the beneficiary designations after some time and concluded that designating Tullos as beneficiary "was perhaps proper because the relationship seemed to be a very fond relationship."

Laura Fielding testified in her deposition that she lacked personal knowledge of any undue influence by Tullos:

> Q. But, first, I want to know if you know anything, anything that you've observed yourself; and then we'll go to other people?
>
> A. About undue influence?
>
> Q. Yes.
>
> A. I don't -- I don't know how to word this.
>
> Q. Well, do the best you can.
>
> A. (No response)

29

Q. Or if you don't know, you can -- that's a perfectly good answer.

A. I'm just going to say I don't know.

Q. All right.

A. At this moment I don't know.

Fielding and Joe Hodge also testified that they had no personal knowledge that Charles lacked mental capacity.

Fielding testified that the last time she spent time with Charles was in 2011 at her aunt's funeral. Fielding agreed that Charles had not visited her at her current or previous home. Fielding also testified that she did not know where Charles was during Hurricanes Rita or Ike, she did not know whether any of her cousins helped him during the hurricanes, and she had not taken care of Charles or picked up prescriptions for him.

Another heir, Gwen Renee Pomonis, testified in her deposition as follows:

Q. All right. So, do you have any personal knowledge of any examples where she exerted undue influence over him?

A. The only thing I can say that I would consider undue influence is when I would go to visit him she would be there but she would leave the room and she would be in -- let's say we were in the living room. She would be in the kitchen banging dishes around just as hard as she could, making a lot of noise.

Q. Okay. So, how was that undue influence?

A. I just think she wanted her presence to be known.

30

Pomonis testified that she was surprised that Tullos was a beneficiary on the UBS accounts because Charles had "told [her] several times he wanted [Pomonis] to go down there and sign paperwork with him." Pomonis also explained that she was never able to go with Charles to the UBS office. Pomonis said that, when she called Charles, "Tullos would screen the calls or not let [her] talk to [Charles] or he would be completely out of it for the day." According to Pomonis: she did not spend holidays with Charles after 2011, and she asked him if he wanted to spend holidays with her family in 2012 and 2013, but he told her he "couldn't really leave his house because of home healthcare[.]" Pomonis also testified that she did not take Charles with her when she evacuated for Hurricane Rita in 2005 and that her parents told her that Charles went with Tullos. Pomonis testified that she did clean up Charles's yard after the hurricanes.

The deposition excerpts from Donald Hodge and Joe Hodge included in the appellate record include no testimony about any personal knowledge of undue influence. Donald Hodge testified that he never visited Charles and that Charles never visited Donald after 2004. Joe Hodge testified that he visited Charles "a couple of times[]" between 2004 and 2014, but Charles never promised that he was planning to leave money or property to Joe.

Analysis

After conducting a de novo review of the record before us, considering the motions for summary judgment and responses, and after examining the summary judgment evidence, the relationship between Tullos and Charles, the opportunity for influence or deception, the circumstances surrounding execution of the challenged instruments, the existence or nonexistence of a fraudulent motive, and whether there was evidence of control by Tullos over Charles when he executed the challenged instruments, the fairness of and overall intention of Charles to designate Tullos as the beneficiary of the accounts, and whether there was a genuine issue of material fact regarding the exertion of undue influence, we conclude the trial court did not err in granting the summary judgment. *See Rothermel*, 369 S.W.2d at 923.

Both Hargroder and Ridley testified that they observed Charles to be in control of his finances and accounts. By contrast, the heirs could not provide any personal knowledge of Tullos's alleged undue influence over Charles. Although an opportunity for influence may have existed because of the close relationship between Tullos and Charles and because of the degree of care provided by Tullos, opportunity alone is not sufficient to prove undue influence without evidence of exertion of influence. *See In re Estate of Sidransky*, 420 S.W.3d at 96. The record gives no indication of force, intimidation, duress, persistent requests or demands, or deceit by

Tullos. *See Rothermel*, 369 S.W.2d at 922. Consequently, the trial court would not have erred in concluding that summary judgment evidence offered by Tullos rebutted any presumption of undue influence. *See Saenz*, 873 S.W.2d at 359.

There also was no evidence that Charles would not have designated Tullos as his beneficiary but for the alleged undue influence. *See Rothermel*, 369 S.W.2d at 922. Hargroder testified that Charles wished to designate Tullos as his beneficiary in recognition of the care she had provided, and Ridley testified that Charles assured him that he wished to designate Tullos as the beneficiary. The heirs testified that they had little contact with Charles and provided little care for him, including a lack of involvement with Charles during Hurricanes Rita and Ike. As a result, we cannot say that material issues of fact exist on Plaintiff's claims for undue influence.

Even assuming without deciding that a fiduciary relationship existed between Charles and Tullos, and after considering the evidence in the light most favorable to the nonmovant, we conclude that Tullos was entitled to a summary judgment on the undue influence claim. Tullos established the fairness of the designations and rebutted any presumption of undue influence. *See Young*, 376 S.W.3d at 216; *Vogt*, 107 S.W.3d at 784. We cannot say the trial court erred in concluding there was no genuine issue of material fact on the undue influence claim because the undisputed summary judgment evidence creates no fact issue as to the existence and exertion of

33

an influence by Tullos, the operation of which subverted or overpowered Charles at the time the beneficiary designations were executed, nor is there a genuine issue of material fact as to whether Charles would have designated Tullos as his beneficiary but for undue influence. *See Rothermel*, 369 S.W.2d at 922; *see also Evans*, 923 S.W.2d at 715 (evidence of undue influence must not merely create surmise or suspicion).

We need not address Appellant's third issue about Appellee's limitations defense. *See* Tex. R. App. P. 47.1; *Horton v. Walden Marina*, No. 09-15-00491-CV, 2017 Tex. App. LEXIS 9124, at *16 (Tex. App.—Beaumont Sept. 28, 2017, no pet.) (mem. op.).

We also note that Appellant's opening and reply briefs on appeal do not address any error on Plaintiff's claim for unjust enrichment. An appellant's failure to brief an issue effects a waiver of that issue on appeal. *See* Tex. R. App. P. 38.1(h), (i); *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 n.1 (Tex. 2001); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284-85 (Tex. 1994). Likewise, Appellee did not cross-appeal on its counterclaim for attorney's fees, and we do not address the attorney's fee counterclaim because of Appellee's waiver thereof. *See* Tex. R. App. P. 38.1(h), (i); *Fredonia State Bank*, 881 S.W.2d at 284-85.

We find no error in the trial court's grant of summary judgment in favor of Tullos, and in denying the Estate's requested relief. We overrule all the Appellant's issues.

We affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 29, 2018
Opinion Delivered August 30, 2018

Before McKeithen, C.J., Kreger and Johnson, JJ.