In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00497-CV
_____

CRITICAL PATH RESOURCES, INC.
AND JOSEPH L. SIMS, Appellants

V.

HUNTSMAN INTERNATIONAL, LLC,
HUNTSMAN PETROCHEMICAL, LLC, ET AL., Appellees

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 15-03-03199-CV

**MEMORANDUM OPINION**

We must decide two main issues to resolve the appeals filed by Joseph L. Sims and Critical Path Resources, Inc. (Critical Path). First, we must determine whether legally and factually sufficient evidence supports the jury's verdict, which favored Huntsman International, LLC and Huntsman Petrochemical, LLC (collectively,

1

Huntsman)[1] on their breach of fiduciary duty, fraud and damages claims that Huntsman filed against Sims, the person it hired to manage a turnaround.[2] Second, we must decide whether one of the jury's findings—that Critical Path "knowingly participated" with Sims in his breach—allowed the trial court to hold Critical Path jointly and severally liable for the damages Sims caused as his conduct relates to the transactions with one of Huntsman's contractors, Critical Path.

We hold that (1) legally and factually sufficient evidence supports the jury's finding that Sims breached his fiduciary duty to Huntsman, (2) legally and factually sufficient evidence supports the damages the jury awarded Huntsman, (3) legally and factually sufficient evidence supports the jury's finding that Critical Path knowingly participated with Sims in his breach, and (4) the "knowing participation" finding authorized the trial court to hold Critical Path jointly and severally liable with Sims, for the damages that Huntsman suffered when Sims breached the fiduciary duties the jury determined he owed Huntsman.

---

[1] The parties and the trial court both treated Huntsman International and Huntsman Petrochemical as a single entity throughout the trial and the judgment does so as well. In the appeal, the parties have not quarreled with this treatment. For convenience, we will also refer to the two Huntsman entities in the opinion collectively without distinguishing between them.

[2] A *turnaround* is a procedure conducted in an industrial plant to maintain or repair a unit used by the plant in manufacturing a chemical or some other product. *Marathon Oil Co. v. Sterner*, 632 S.W.2d 571, 572 (Tex. 1982).

# I.    Issues

The trial court rendered a judgment against the five parties Huntsman sued, but Sims and Critical Path are the only two parties to the suit who filed appeals. Sims filed a brief in which he raises four issues for our review. He argues (1) the trial court abused its discretion by overruling his objections to the charge, (2) insufficient evidence supports the jury's verdict, (3) the answers the jury provided to the questions in the charge conflict in ways that cannot be reconciled, and (4) the trial court erred by excluding evidence Sims wanted to introduce.

Critical Path is the other party that appealed. It raises four issues in its brief. According to Critical Path, the court abused its discretion by signing a judgment holding it liable to Huntsman when the jury (1) awarded no damages against Critical Path, (2) did not decide whether Critical Path, through its conduct, intended to injure Huntsman, (3) did not decide whether Critical Path aided and abetted Sims in breaching the duties he owed Huntsman, and (4) did not decide whether Critical Path's conduct was a substantial factor in causing the damages Huntsman suffered from Sims's breach.

For the reasons explained below, we overrule the appellants' issues and affirm the judgment.

## II.     Background

We discuss the background that gave rise to Huntsman's claims in the light favoring the jury's verdict, since Huntsman prevailed in the trial.[3] The testimony in the record shows that in August 2013, Huntsman hired Sims as its turnaround manager. Sims's job required that he manage turnarounds Huntsman wanted to conduct at its chemical plant in Port Neches, Texas. After hiring Sims, Huntsman relied on Sims when it hired Critical Path to work on the turnaround. It also hired JV Industrial Companies, Ltd. (JV Industrial) to do other work on the turnaround. In turn, JV Industrial contracted with Titan 360 Industrial Services LLC (Titan) to supply JV Industrial with several employees for the turnaround. JV Industrial then charged Huntsman for the Titan employees that Titan was charging to the turnaround in its bills.

The evidence in the trial shows that Sims knew an individual named Alvin Cormier before he became Huntsman's turnaround manager. Sims told Cormier before Huntsman hired him that he intended to apply for the job of turnaround manager with Huntsman, and that if successful, he would use his influence to get Huntsman to send Critical Path work. The evidence also shows Sims and Cormier

---

[3] *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 109 (Tex. 2000).

4

were not just merely acquainted with each other, as the two men were the co-owners of a pipeline construction business, Action Field Services, Inc., when Sims applied with Huntsman for the position of turnaround manager.

Cormier owns Critical Path. In the trial, Cormier testified that Critical Path had been trying to get work from Huntsman long before Sims went to work there. But before Sims took the job as Huntsman's turnaround manager, Huntsman had never sent Critical Path any work.[4]

After Sims became Huntsman's turnaround manager, Sims fulfilled the promise he made to Cormier. He used his position to influence Huntsman in its decision about whether to use Critical Path on the turnaround. Within two months of Sims becoming Huntsman's turnaround manager, Huntsman hired Critical Path for the turnaround. Before Huntsman stopped sending Critical Path work, Critical Path billed Huntsman nearly $1,100,000[5] for the work it claimed to have performed on the turnaround. A forensic accountant, who Huntsman called in the trial, estimated Critical Path's invoices included just over $600,000 of items that in the

---

[4] Critical Path did have a general services agreement with Huntsman before Sims became Huntsman's turnaround manager. The general services agreement between Huntsman and Critical Path allowed (but did not require) Huntsman to use Critical Path.

[5] For convenience, we have rounded each dollar figure discussed in the opinion to the nearest whole number.

accountant's opinion were unauthorized or unsupported under the contract between Huntsman and Critical Path.

When Sims testified, he agreed he never told Huntsman that he and Cormier co-owned Actions Field Services.[6] Moreover, Sims never told Huntsman that he promised Critical Path's owner that he would encourage Huntsman to send Critical Path work, nor did he reveal that Cormier sold him his shares in Action Field Services for $1,000 within months after Huntsman placed him in charge of managing Critical Path's work. As Huntsman's turnaround manager, Sims had to place Huntsman's interest in the turnaround above his own, but the record includes evidence that allowed the jury to conclude Sims favored his interests above Huntsman's. For instance, in his role as turnaround manager, Sims had to sign daily timesheets the contractors working on the turnaround turned into him. This responsibility included signing timesheets on Critical Path's work. Huntsman used these timesheets as part of its accounting process when deciding whether to pay the bills the contractors sent Huntsman for working on the turnaround Sims managed.

---

[6] The instructions the court included with the fiduciary duty question explain Sims had the burden to prove he complied with the fiduciary duty he owed Huntsman, which required him to prove several things. One matter he had to prove was that he "fully and fairly disclosed all important information to HUNTSMAN concerning each of the transactions in which he was involved."

Critical Path's daily timesheets contain charges for Cormier's time, time Sims approved. Other testimony shows, however, that Cormier was not regularly present on the turnaround, and he was not authorized by Critical Path's contract on the turnaround to bill Huntsman for his time. Yet Sims approved Critical Path's timesheets even though they contain entries that include Cormier's time. The evidence shows he never alerted Huntsman to his decision to allow Cormier to bill for his work.

Other evidence before the jury allowed the jury to conclude Sims used his position to influence JV Industrial to hire Titan, which then supplied JV Industrial with employees for the turnaround. Witnesses from JV Industrial testified JV Industrial had no need for Titan's assistance to find employees for the turnaround, yet other evidence shows Sims directed JV Industrial to hire Titan anyway. Significantly, Sims never told Huntsman he directed JV Industrial to hire Titan as a subcontractor, nor did he disclose that when JV Industrial hired Titan, Titan began paying him for the help he was giving Titan on the turnaround. Bank records and tax records tied to Sims show that Sims received around $344,000 from Titan before he resigned from his position with Huntsman.[7] Titan's president, James S. Petty, Jr.,

---

[7] Sims received the payments from Titan relevant to the suit in 2014. Huntsman traced the payments to a federal tax form Titan issued to Sims, Form 1099-MISC. The record also contains evidence showing James Petty, Titan's

testified that Titan paid Sims for the "consulting services" he provided Titan. Using Titan's account, Petty began paying Sims for his "help" within weeks of the day JV Industrial hired Titan on the turnaround.

When he testified, Sims agreed that payments to an employee of the entity for the purpose of getting the company's employee to recommend the contractor for work are considered to be kickbacks in the construction industry. According to Sims, the payments Titan reported to the IRS using his social security number was money Titan paid him for services that were provided by his wife. Sims's wife, however, testified the $344,000 Titan reportedly paid Sims is money that did not belong to her. As turnaround manager, the evidence shows Sims routinely approved JV Industrial's daily timesheets. These included timesheets for Titan employees who worked on the turnaround.

The forensic accountant Huntsman called as a witness in the trial testified that Titan charged Huntsman over $3,500,000 for the work Titan claimed to have done

president and CEO, knew Sims before Sims took the job at Huntsman. According to Petty, who testified in the trial, he formed Titan in November 2013. Titan had no prior relationship with Huntsman or to JV Industrial before the turnaround. He explained it also had no experience working on turnarounds. Titan began paying Sims roughly $30,000 per month shortly after Titan began working on the turnaround, paying Sims twice each month for his help. Petty explained that he billed the turnaround project each day for his time under Titan's contract to JV Industrial, but he acknowledged he was only at the Huntsman plant one time for less than an hour.

on the turnaround. The accountant explained that Titan's invoices include hundreds of thousands of dollars in unauthorized, fraudulent, and unsupported charges. He estimated Titan's excessive bills to be just over $2,000,000 of the $3,500,000 that it billed.

In September 2014, Huntsman began to suspect there were problems with Critical Path's bills. Huntsman placed Rick Kovacich, another of its managers, in charge of investigating whether Critical Path was billing Huntsman properly for its work. Based on his investigation, Kovacich recommended to Huntsman that it stop paying Critical Path's bills and Huntsman complied. When Huntsman quit sending Critical Path work, Huntsman owed Critical Path a $350,000 balance on bills that it had not paid.

In March 2015, Critical Path sued Huntsman for around $350,000 to collect the outstanding balance it claimed Huntsman owed it for work on the turnaround. In August 2015, Critical Path amended it pleadings, alleging Huntsman owed it over $2,000,000 in damages in lost profits and on the uncollected balance Huntsman still owed it for its work.

In response to the suit, Huntsman sued Critical Path in a counterclaim, alleging Critical Path had gotten a Huntsman employee, who it did not then identify, to breach the fiduciary duty the employee owed Huntsman given the manner the

9

employee had done his work. Later, Huntsman added Sims, Titan, and several others as third-party defendants to the suit.[8] In Huntsman's counterclaim,[9] Huntsman also alleged that Critical Path breached the terms of the contract it had with Huntsman based on the manner it used Sims during the turnaround.

In October 2017, the parties tried the case to a jury in a six-day trial. When the parties rested, the trial court submitted twenty-two issues to the jury in its charge. Several issues the court submitted to the jury contain multiple subparts. As is relevant here, the jury found:

(1) Sims violated the fiduciary duty he owed to Huntsman during the turnaround in the transactions that involved Critical Path (Question 5);

(2) Huntsman suffered $167,000 in damages because of Sims's breach of the fiduciary duty he owed Huntsman, as his duty relates to the transactions that involved Critical Path (Question 6);

(3) Critical Path knowingly participated in the breach of fiduciary duty Sims owed Huntsman (Question 7);

(4) Sims violated the fiduciary duty he owed to Huntsman, based on his conduct in the transactions that involved Titan (Question 8);

---

[8] We note the final judgment awards Huntsman damages against third-party defendants we have not named in the opinion. To shorten and simplify the opinion, we have elected not discuss these third-party defendants or the claims involving them unless necessary so the opinion can focus on the issues raised by the parties that appealed.

[9] Huntsman's Second Amended Counterclaim and Third-Party Petition is its live pleading for the purpose of the trial.

10

(5) Huntsman suffered $851,000 in damages from Sims's breach, as his conduct related to the transactions involving Titan (Question 9 for Sims, Question 16 for Titan);

(6) Sims received $300,000 in profit, directly or indirectly, while employed at Huntsman on the turnaround (Question 11);

(7) Sims defrauded Huntsman based on his involvement with the transactions that involved Critical Path (Question 12);

(8) Sims defrauded Huntsman based on his involvement with the transactions that involved Titan (Question 15);

(9) Huntsman suffered no damages from the fraud Sims committed as the fraud relates to the transactions that involved Critical Path (Question 13);

(10) Sims and Titan's president, Petty, engaged in a joint enterprise in the work Titan performed on the turnaround (Question 18).

Based on the jury's answers to the charge, the trial court rendered judgment in Huntsman's favor on some—but not all—of Huntsman's claims. As is relevant here, the judgment against Critical Path hinges on the jury's answers to Questions 5, 6 and 7. In these questions, the jury found Sims failed to comply with his fiduciary duty he owed to Huntsman, given the fiduciary duty he owed Huntsman as its turnaround manager. In Question 5, the jury found Sims breached the fiduciary duty he owed Huntsman in the transactions that involved Critical Path. In Question 6, the jury found Huntsman suffered $167,000 in damages because of Sims's breach. In Question 7, the jury found Critical Path knowingly participated with Sims in the

11

breach. Based on the jury's answer to Questions 5, 6, and 7, the trial court rendered judgment holding Critical Path and Sims *jointly and severally liable*[10] for the damages Sims caused, as his breach involved Critical Path.

The judgment includes additional awards against Sims for the damages the jury found he caused in the transactions relevant to Huntsman's claims against Titan. For instance, on the claim Huntsman filed against Sims alleging he defrauded Huntsman in the transactions with Titan, Huntsman recovered $851,000 in the judgment. The judgment also requires that Sims disgorge $300,000 in profit the jury found Sims obtained while working as Huntsman's turnaround manager.

We note the judgment includes prejudgment interest awards on all awards except two, the $300,000 the jury awarded to strip Sims of the profit he gained while working as turnaround manager and the punitive damages the jury awarded against Petty and Titan. Finally, the judgment authorizes Huntsman to recover postjudgment interest and taxable costs. The parties have not challenged the postjudgment interest and taxable costs the trial court awarded in the judgment in their appeals. Because Sims's issues require more discussion, we address them first.

---

[10] "With *joint and several liability*, the liability of two or more obligors may be enforced against them all by a joint action or against any of them by an individual action." BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 479 (2d ed. 1995).

III.    Sims's Appeal

A. Charge Error

1. Waiver

In his first issue, Sims argues the trial court abused its discretion by overruling his objections to the charge. Sims contends the trial court erred by placing the burden of proof on him in Questions 5 and 8, the fiduciary duty questions, which required him to prove he complied with his fiduciary duty to Huntsman as it relates to the transactions that involved Titan and Critical Path. According to Sims, the charge should have required Huntsman to prove that Sims breached the fiduciary duty he owed Huntsman and instead, the charge placed the burden on him to prove he complied with his fiduciary duty.[11]

Before addressing the merits of Sims's argument, however, we must decide whether he preserved his complaints concerning Questions 5 and 8 for our review. In the charge conference, Sims never specifically objected to the burden of proof

---

[11]When the appellant timely objects to the charge and then challenges the sufficiency of the evidence supporting the jury's answers to those issues on appeal, the appellate court must first determine whether the appellant's objections have merit. If so, the court determines whether sufficient evidence supports the verdict after measuring the evidence against a corrected charge. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

problems he complains about in his appeal. Instead, Sims submitted a series of questions on the fiduciary duty breach, which the trial court then marked as refused.

The problem with the questions Sims tendered and the court refused is that the questions he submitted fail to submit the case to the jury in a substantially correct form. The specific problem with the questions Sims submitted is the way Sims conditioned them on a preliminary question. The preliminary question required the jury to decide if Sims profited or benefited from the transactions between Huntsman, Critical Path, and Titan.[12] By predicating the breach of fiduciary duty question on the jury's answer to a predicate question, the jury would have had to decide whether Sims profited or benefited from the transactions before deciding the question asking whether he was guilty of a breach.

To preserve error by tendering questions, the appellant must show the questions he provided submit the case properly based on the live pleadings and the evidence admitted during the trial.[13] Looking first to Huntsman's pleadings, we

---

[12] The preliminary questions address two sets of transactions. One question asked whether Sims profited or benefited in the transactions with Critical Path (the question the trial court refused that Sims submitted to replace Question 5). The other asked whether Sims profited or benefited from the transactions with Titan (the question the trial court refused that Sims submitted to replace of Question 8).

[13] *See* Tex. R. Civ. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.").

14

observe Huntsman alleged Sims failed to disclose that he had promised work to business partners before applying with Huntsman for the job of turnaround manager. We conclude Huntsman's pleadings include a claim alleging Sims breached his fiduciary duty by placing himself in a position where his interests conflicted with Huntsman's. The evidence before the jury addresses both Huntsman's conflict-of-interest and profit and benefit theories about Sims's alleged breach. Sims's predicate issue, as to both the Critical Path transactions and the Titan transactions would have prevented the jury from deciding whether Sims placed himself in a position where he had a conflict of interest in managing their work.

Under Texas law, "[a]n employee has a duty to act primarily for the benefit of his employer in matters connected with his employment."[14] Thus, the employee must place his employer's interests above that of his own.[15] The fiduciary duty required of employees prohibits an employee from acting "for his future interests at the expense of his employer or [from engaging] in a course of conduct designed to

---

[14] *Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 762-63 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *see also Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002)).

[15] *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992).

hurt his employer."[16] Thus, a party making a fiduciary duty claim does not always have to prove the defendant profited or benefited personally from his breach. In some cases, it may be enough to establish the plaintiff was damaged by the fiduciary's breach.[17]

Rule 277 of the Rules of Civil Procedure states that trial courts "shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict."[18] The court complied with that Rule—it submitted the case to the jury using a broad-form charge.

Rule 278 provides the "[f]ailure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment[.]"[19] We hold Sims failed to comply with Rule 278. Because Sims failed to either submit a substantially correct charge or specifically point out his complaints

---

[16] *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 904 (Tex. App.—Dallas 2014, pet. denied).

[17] *See, e.g.*, *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512-14 (Tex. 1942) (explaining that fiduciaries must make a full disclosure of material facts in their knowledge as the facts relate to the parties' fiduciary relationship).

[18] *Id.*

[19] *See id*. 278.

16

about Questions 5 and 8 by objecting to the charge, we hold Sims failed to preserve the complaints he raises in his first issue about these questions in the charge.[20]

> 2. Merits, Charge Error Claims on Questions 5 and 8
>
> a. Question 5, the fiduciary duty question as it relates to the transactions that involved Critical Path

Even if Sims did preserve his right to complain about Questions 5 and 8, however, we would still find his arguments alleging charge error lack merit. When measured by the scope of the fiduciary duty in the charge, the evidence before the jury shows there was no issue of material fact the jury needed to decide about whether Sims obtained a benefit or profit from his breach.

Here, the evidence before the jury shows that reasonable jurors could not have found that Sims did not benefit from the transactions between Critical Path and Huntsman. Nor could reasonable jurors have found Sims did not benefit from the transactions between Titan and Critical Path.[21]

---

[20] *Id.*

[21] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (explaining it's "the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge"); COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT, PJC 104.2 & cmt. (2018) (explaining that in a fiduciary duty case, "the presumption of unfairness operates to shift both the burden of producing evidence and the burden of persuasion to the fiduciary").

At the outset, we note Texas law applies a presumption of unfairness to transactions involving a fiduciary and the person or entity to whom he owes his duty.[22] The Committee on Pattern Jury Charges of the State of Texas has explained that when defendants act as fiduciaries, "the presumption of unfairness operates to shift both the burden of producing evidence and the burden of persuasion to the fiduciary."[23] Here, no one disputes the transactions at issue occurred while Sims was working for Huntsman on the turnaround. Further, the record shows that Sims failed to lodge objections to the scope of the fiduciary duty he owed Huntsman, as the trial court outlined his duties in the charge. For that reason, we look to whether the jury could have refused to find, based on the evidence, that Sims benefited from the transactions involved based on the broad fiduciary duties outlined in the charge.[24]

The charge asked the jury whether the transactions with Critical Path, and the transactions with Titan, were "fair and equitable to HUNTSMAN." The charge also states that Sims could not act "for his future interests at the expense of his employer

---

[22] *Tex. Bank & Tr. Co. v. Moore*, 595 S.W.2d 502, 508-09 (Tex. 1980); *see also Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 699 (Tex. 2000).

[23] PJC 104.2 cmt. (explaining, in the comment, that "[t]he burden of proof is on the fiduciary when the fiduciary has profited or benefited from a transaction with the beneficiary or placed himself in a position in which his self-interest might conflict with the beneficiary").

[24] *See Brewer & Pritchard*, 73 S.W.3d at 201.

or engage in a course of conduct designed to hurt his employer."[25] The charges required Sims to act "in the utmost good faith[,]" to exercise "the most scrupulous honesty[,]" to place Huntsman's interest "before his own[,]" to "not use the advantage of his position to gain any benefit for himself at" Huntsman's expense, and to "fully and fairly" disclose "all important information to HUNTSMAN concerning each of the transactions in which he was involved." Sims never objected to any of this language. For that reason, we measure the evidence relevant to Sims's claim he reaped no benefits from the transactions in the context of the duties outlined in the charge.[26]

Turning to the evidence in the trial, Sims testified that, when interviewing for the position of turnaround manager, he told Huntsman he had worked for Action Field Services. He argues the jury could have found revealing that fact was a full and fair disclosure of everything important involving the transactions after that

---

[25] While an *employee's* fiduciary duty to his employer is generally limited by law, the scope of the duties described in the charge are very broad. Sims never objected to the charge by claiming it burdened him with duties broader than the ones he had under the law.

[26] *See* PJC 104.2 cmt. (explaining in the comment that "[if] there is a dispute about whether the fiduciary profited or benefited from a transaction with the beneficiary, or whether the fiduciary placed himself in a position in which his self-interest might conflict with his obligations as a fiduciary, a jury question may be necessary to decide that issue"); *Osterberg*, 12 S.W.3d at 55 (explaining how reviewing courts are to measure evidence against the charge when conducting a sufficiency review).

between Huntsman, Critical Path, and Titan on the turnaround. But a disclosure about one's employment by a company discloses nothing about the individual's ownership in the company. Nor does such a disclosure reveal the employee has promised to use his influence for his former employer with his new employer if hired. Sims never testified he ever disclosed the fact that Cormier sold him Cormier's shares of Action Field Services for $1,000 about five months after Sims became Huntsman's turnaround manager.[27] Nothing in the testimony shows he disclosed he and Cormier owned a business together or that he promised to use his influence to get Huntsman to send Critical Path work. Under the circumstances, reasonable jurors could not have found Sims's partial disclosure about his employment by Action Field Services amounted to a full and fair disclosure of "all important information" about "each of the transactions in which he was involved."

Sims contends he derived no benefit from the recommendation he made to Huntsman suggesting Critical Path was qualified to perform work on a turnaround. But when Sims testified, he acknowledged it benefited him to acquire Cormier's stock.[28] Asked whether he thought the stock in Action Field Services had value, Sims

---

[27] During the trial, the trial court admitted the purchase agreement that contains Cormier's and Sims's signature, which shows the sale occurred in January 2014.

[28] There is no evidence before the jury showing what Action Field Services was worth in January 2014, such as a balance sheet or list of assets.

answered: "I thought so, yes." Thus, even if Action Field Services' stock was worth less than the $1,000 Sims paid for it, Sims's testimony shows he viewed the purchase as a benefit when the transaction occurred. And nothing in the record shows what the stock in Action Field Services was worth when the sale of stock occurred.

Finally, Sims benefited from the transactions by being paid a salary by Huntsman that required him to place Huntsman's interest over his own. The Texas Supreme Court has recently explained that a remedy is available for a fiduciary's breach "even when the principal is not damaged."[29] The Court explained: "It is the agent's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation."[30] The Court recognized that fee forfeiture, under circumstances that involved an attorney-client relationship, was appropriate.[31]

Thus, equity allows the factfinder to disgorge the fiduciary's salary when the fiduciary is guilty of breaching the duty of loyalty that he owed the plaintiff that sued him in the case.[32] Measuring Sims's duty to Huntsman by the duties imposed on him by the language in the charge, we conclude no reasonable jury could have concluded

---

[29] *First United Pentecostal Church v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017).
[30] *Id.*
[31] *Id.*
[32] *Id.*

Sims did not benefit by placing his self-interest over Huntsman's during the turnaround.[33]

> b. Question 8, the fiduciary duty question as it relates to the transactions that involved Titan

Assuming Sims preserved his right to complain about the language involving the burden of proof in Question 8, we find Sims's argument without merit for reasons much like those discussed in section III. A. 2.a. of the opinion above. No reasonable juror could have refused to find that Sims benefited based on the salary he earned and the money he received directly from Titan while charged with the responsibility to manage Titan's work.

After considering the arguments Sims raises in his first issue, we hold that his arguments were either not preserved for review or that if they were, they have no merit. For these reasons, issue one is overruled.

---

[33] *See City of Keller*, 168 S.W.3d at 816 (explaining that "[e]vidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case"); *Lundy v. Masson*, 260 S.W.3d 482, 505 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (evidence relevant to the question of the burden on the fiduciary issue did no shift); *Vogt v. Warnock*, 107 S.W.3d 778, 784-85 (Tex. App.—El Paso 2003, pet. denied) (same); PCJ 104.2 cmt.

B. Legal and Factual Sufficiency

1. Standard of Review

Sims's second issue contends the evidence is legally and factually insufficient to support the jury's verdict. When conducting a legal sufficiency review, we consider whether the evidence in the trial enabled reasonable and fair-minded jurors to reach the verdict that is being challenged in the appeal.[34] Evidence cannot legally support a verdict if

> (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[35]

More than a scintilla of evidence exists when reasonable and fair-minded jurors might reach different conclusions about the verdict based on the evidence admitted in the trial.[36]

In a factual-sufficiency review, the evidence supporting the jury's verdict will be found sufficient if the evidence the jury considered allows "reasonable and fair-minded people to reach the verdict under review."[37] When reviewing a verdict, we

---

[34] *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).
[35] *Id.* (cleaned up).
[36] *See id.*
[37] *City of Keller*, 168 S.W.3d at 827.

23

must defer to the decisions the jury made about the weight the jury gave the evidence admitted in the trial.[38] In resolving disputed facts, the jury can observe the witnesses when they testified and choose to believe one witness's testimony over the testimony of others.[39] The jury may decide an issue in the case by finding some witnesses more credible than others.[40]

That said, decisions a jury makes about "credibility must be reasonable."[41] For instance, jurors are "not free to believe testimony that is conclusively negated by undisputed facts."[42] Even when evidence is undisputed, "it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess."[43] Sims complains the evidence cannot support the verdict. But to reverse a verdict on grounds of factual insufficiency, the reviewing court must "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrates bias."[44]

---

[38] *Id.*

[39] *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

[40] *Id.*

[41] *City of Keller*, 168 S.W.3d at 820

[42] *Id.*

[43] *Id.* at 821.

[44] *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019) (cleaned up).

2. Breach, damages, and the transactions involving Critical Path

In part, Sims argues the evidence is legally and factually insufficient to support the jury's answer to Question 5—which asked whether Sims complied with his duty to Huntsman in the transactions that involved Critical Path. He also argues the evidence does not support the jury's answer to Question 6—which asked the jury to decide the damages, if any, Sims caused Huntsman in the transactions that involved Critical Path.

We measure the evidence before the jury in light of the broad duties Sims owed Huntsman, as the court outlined those duties in the charge.[45] Given the sweeping breadth of his duties, Sims could neither act for his own interests at the expense of Huntsman, nor engage in conduct designed to hurt Huntsman.[46] In addition to the above two duties—duties employees generally owe to their employers—the charge defined Sims's duty to include acting in "utmost good faith[,]" with "most scrupulous honesty[,]" and required him to "fully and fairly disclose[] all important information to HUNTSMAN concerning each of the transactions in which he was involved."[47]

---

[45] *See Osterberg*, 12 S.W.3d at 55.

[46] *See McCullough*, 435 S.W.3d at 904.

[47] *See Kinzbach Tool*, 160 S.W.2d at 513 (explaining the employee's fiduciary duty, under the circumstances in that case, required the employee, as fiduciary, to "make full disclosure" to "the party with whom he stands in such relationship").

25

We summarize some of the evidence relevant to the jury's finding of breach below. Viewing the evidence in the light that favors the jury's verdict, the record contains evidence showing the following:

- Sims and Cormier knew each other and had worked with each other for many years before Huntsman hired Sims. Before taking the job at Huntsman, Sims told Cormier that if Huntsman hired him to manage the turnaround, Sims would use his influence to get Huntsman to send Critical Path work. Sims recommended Critical Path for the turnaround after getting the job of turnaround manager. He then failed to exercise appropriate management oversight of Critical Path's work, given his duties as turnaround manager. One of his duties included approving daily timesheets turned in by Critical Path on the work it performed on the turnaround. Huntsman required its managers to sign the timesheets as part of its accounting process, so individuals in the billing department who then reviewed the approved timesheets would have information from Huntsman's turnaround manager to indicate the contract employees in the timesheets worked on the turnaround;

- When Sims went to work for Huntsman, he and Cormier each owned half the stock in a construction company, Action Field Services. Critical Path, a company owned by Cormier, provided $350,000 in capital to Action Field Services and Sims did not provide it with any capital. When Sims started with Huntsman, Action Field Services had no assets, employees, or debt, but it had a track record that included jobs completed on time. Several months after Sims became Huntsman's turnaround manager, Cormier sold his stock in Action Field Services to Sims for $1,000, making Sims that company's sole owner. Sims testified he believed that owning Action Field Services had value to him because owning a construction company with a track record of more than two years in the construction business and with an experience modifier qualified the company to bid for further construction work when compared to companies that did not have that history. Sims never told Huntsman that he and Cormier co-owned Action Field Services before he took the job with Huntsman, or when he bought Cormier's

26

shares. Sims testified that he routinely signed Critical Path's daily timesheets for its work without examining them because he did not have the time;

- Over the course of the turnaround, Sims instructed Cormier and other employees of Critical Path to provide services to Huntsman. Under Critical Path's contract, some of the work reflected in the timesheets qualified as extra work under Critical Path's contract and required Huntsman's written approval in a process that involved authorizing a contractor to perform extra work. Sims never told Huntsman he routinely authorized Critical Path to vary from the work Huntsman hired Critical Path to perform, or that he was routinely approving daily timesheets that contained time for individuals not authorized by the contracts relevant to Critical Path's work. Huntsman paid many of Critical Path's invoices, even though they included time Huntsman later claimed was extra, unapproved, and unauthorized under the contracts relevant to Critical Path's work. In September 2014, Huntsman decided to investigate Critical Path's billing practices. During its investigation, it learned that Sims was allowing Critical Path to do work outside the work called for under its contracts for the turnaround; and

- At one point, Sims directed Chad Murphree, an employee of Critical Path, to turn Critical Path's timesheets into him rather than submitting them to another Huntsman employee. Sims also directed Critical Path's employees to tell JV Industrial to recommend Titan as a reputable subcontractor for the turnaround. Sims was responsible for managing JV Industrial's work, duties that required him to sign JV Industrial's daily timesheets. Sims approved these without telling Huntsman that he had encouraged JV Industrial to hire Titan. In return for Sims's help in sending it work, Titan paid Sims kickbacks, which totaled nearly $344,000 over the course of the turnaround.

Having examined the evidence before the jury, we conclude the record contains legally and factually sufficient evidence to support the jury's answer to Question 5.

In another part of his issue two argument, Sims suggests the evidence admitted in the trial does not support the jury's decision awarding Huntsman $167,000 in Question 6. Question 6 asked the jury to decide the amount Sims caused Huntsman in damages based on his breach of the fiduciary duty he owed Huntsman in the transactions that involved Critical Path. Sims argues the jury's finding on Question 6 conflicts with the jury's findings to Questions 3 and 13. In Questions 3 and 13, the jury failed to award Huntsman any money on its claims against Critical Path even though the jury found in response to other questions on Huntsman's claims that Critical Path breached its contract with Huntsman and committed fraud. Sims concludes the jury's answer to Question 6, in which the jury found he damaged Huntsman, conflicts with the jury's findings in Question 3 and 13 that Critical Path did not damage Huntsman based on Critical Path's breach of contract and fraud.

We note the findings of no damages in Questions 3 and 13 concern the claims Huntsman submitted against Critical Path for breach of contract and fraud. Relying on Huntsman's failure to secure favorable findings on Questions 3 and 13, Sims argues the jury could not have logically found he damaged Huntsman by breaching the fiduciary duty he owed Huntsman in the same transactions since they too involved Critical Path. For two main reasons, we disagree. First, we cannot tell exactly what evidence the jury relied on when answering Question 6, the damages

28

finding relevant to the $166,688 the jury awarded against Sims. Second, the jury's answers to Questions 3 and 13 are not inherently inconsistent with its answer to Question 6 finding Sims responsible for $167,000 based on Sims's involvement with the transactions involving Critical Path. The jury could have found Sims *caused* Huntsman's damages and Critical Path did not because Sims was responsible for the damages because he allowed Critical Path to do work in excess of that called for in Critical Path's contract.

At this point, it's impossible to identify the exact evidence the jury relied on when it found Sims damaged Huntsman in the amount of $167,000 by breaching the fiduciary duty that he owed Huntsman in the transactions involving Critical Path. The forensic accountant Huntsman called as a witness testified Critical Path charged Huntsman for Cormier's time when Cormier's charges were not authorized under the terms of Critical Path's contract on the turnaround.[48] The evidence shows Huntsman expected Sims, as its turnaround manager, to manage the work of the

---

[48] Critical Path's contract, which the court admitted into evidence, reflects that Critical Path's agreement did not authorize it to bill Huntsman for the time of a *principal consultant*. Critical Path's billing records, also in evidence, show Cormier began billing Huntsman as a *principal consultant* on the turnaround. Sims approved timesheets that included Cormier's time as principal consultant. Huntsman, in turn, paid invoices, charging for the time Cormier charged Huntsman based on the timesheets approved by Sims. Cormier's part of the Critical Path bills totaled $167,0000.

contractors so that they were complying with the terms of their respective contracts. There is evidence showing Sims authorized Critical Path to do extra work. Thus, the jury could have found Sims responsible for authorizing Critical Path to perform extra work that Huntsman would not have authorized had Sims complied with the broad fiduciary duties he owed Huntsman, as his duties were outlined in the charge.

It's true that the $167,000 may represent the time Cormier billed to the turnaround, as the charges included in Critical Path's bills add up to around $167,000. A spreadsheet, prepared by Huntsman's forensic accountant, includes a detailed accounting about the damages Huntsman relied on to show how Huntsman was damaged by Sims and Critical Path. The spreadsheet shows Huntsman claimed Critical Path billed it over $600,000 more than the charges Huntsman claimed its contract required it to pay. And Critical Path billed Huntsman nearly $1,200,000 for its work over the course of the turnaround. Huntsman paid over $850,000 of Critical Path's total bills. So the jury found $167,000 of the difference as damages Sims caused and decided the remaining amount, $183,000 was an amount that neither Huntsman nor Critical Path owed. Exactly how the jury came to those conclusions is difficult at this point to fully explain, but Sims is the party who must explain how the findings are based on legally and factually insufficient evidence. Here, the jury could have reached its conclusions in any number of ways. For instance, the jury

could reasonably have found that Sims damaged Huntsman when Critical Path did not.

3. Disgorgement

Within his second issue, Sims also contends the evidence does not support the jury's damage award of $300,000 on Question 11. In Question 11, the jury found Sims profited by the amount of $300,000 for the work he performed for Huntsman as its turnaround manager.[49] Question 11 allowed the jury to consider both the transactions involving Critical Path (Questions 5) and the transactions involving Titan (Question 8). The charge conditioned the jury's answer on Question 11 to a "Yes" answer to either Question 5 or Question 8. So, the evidence we look to when measuring whether it is sufficient is the evidence of Sims's profits from any of his breaches as they relate to the transactions involving Critical Path or the transactions

---

[49] In his brief, Sims describes the award as a "disgorgement" award. We further note that Sims did not object to Question 11 or tender an issue asking the court to instruct the jury to limit the damages the jury could consider in answering Question 11 to restrict the award to the income he earned from Huntsman. And we note a fiduciary, who is guilty of having breached his fiduciary duty, can face a claim alleging the fiduciary must forfeit the salary he made when working for the entity to whom the duty was owed. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (noting that "even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work"); *Orbison v. Ma-Tex Rope Co., Inc.*, 553 S.W.3d 17, 31 (Tex. App.—Texarkana 2018, pet. denied) (in a bench trial, concluding the fiduciary "was subject to the forfeiture of his salary").

involving Titan, as the jury could look to both sets of transactions when answering Question 11 of the charge.

To determine whether the evidence supports the $300,000 award, we need look no further than the evidence showing Titan paid Sims around $344,000 for the "consulting" work he did for Titan while working for Huntsman in a position that required him to manage the work of the contract employees who worked on the turnaround. The evidence allowed the jury to consider this money a kickback for the role he played in getting Titan the work and the scheme that involved approving timesheets that led Huntsman to pay Titan for work it did not do.

We also reject Sims's argument claiming the evidence does not support the jury's finding he breached his fiduciary duty as it relates to the transactions with Titan. As to the Titan transactions, Question 11 allowed the jury to consider the damages involving the Titan related transactions if the jury answered Question 8 in Huntsman's favor. As to the damages relevant to the transactions with Titan, the evidence includes Petty's testimony. His testimony shows Titan paid Sims twice a month, at the rate of around $30,000 per month, beginning the month Titan began working on the turnaround. Petty explained Titan obtained the work after Sims recommended it for the job even though Titan had no experience on turnarounds. Petty acknowledged that before Titan worked on Huntsman's turnaround, he had no

experience with a business that provided temporary workers for contractors working on turnarounds. After Titan made the first payment, Titan continued to pay Sims for the role he played in helping Titan overbill Huntsman for its work. Sims's assistance included getting JV Industrial and Huntsman to pay for the time Titan was charging JV Industrial on the turnaround. Petty explained he consulted with Sims about every major decision Titan made during the turnaround. Petty testified Sims's assistance during the turnaround helped build Titan. Petty billed JV Industrial for his work. Sims approved timesheets that included Petty's time, one of the steps of approval Titan needed before Huntsman would approve JV Industrial's bills. JV Industrial's bills included charges at issue in the trial for Titan's work. Sims never told Huntsman about his arrangement with Titan. He never disclosed to Huntsman that Titan was paying him for his help to inflate Titan's bills.

We conclude the testimony before the jury allowed reasonable jurors to determine that Sims breached the fiduciary duty he owed Huntsman in the transactions involving Critical Path. The evidence also supports the jury's finding that Sims profited from his breach.[50] Together with the other evidence, which we have described in section III. B.2. of the opinion, we conclude there is enough evidence in the record to support the jury's answer to Question 8, finding Sims failed

---

[50] *See id*.; *Suberu*, 216 S.W.3d at 793.

to comply with the fiduciary duty he owed Huntsman as his duty relates to the transactions that involved Titan.[51]

4. Sufficiency of the evidence, the findings of fraud pertinent to Titan's work

In another section of Sims's second issue, he complains the evidence is legally and factually insufficient to support the jury's finding on Question 15. In Question 15, the jury found Sims committed fraud during the turnaround in the transactions that involved Titan. Question 15, as phrased, includes two theories of fraud—fraud by misrepresentation and fraud by nondisclosure.[52]

Under Texas law, fraud by misrepresentation requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury."[53] A misrepresentation is material if "a reasonable person would attach importance to and would be induced

---

[51] *See City of Keller*, 168 S.W.3d at 827.

[52] In the charge conference, Sims did not object to the instructions that accompany Question 15, which allowed the jury to find fraud based either on Huntsman's misrepresentation theory, its nondisclosure theory, or both.

[53] *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (cleaned up).

to act on the information in determining his choice of actions in the transaction in question."[54]

In contrast, fraud by nondisclosure occurs when

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.[55]

Under Question 15, the jury could answer "Yes" as to Sims and Titan under either of Huntsman's theories alleging fraud. In our review, we measure the evidence supporting the jury's finding by the evidence in the trial relevant to either theory that would have allowed the jury to answer "Yes" on Question 15.[56]

Turning to the specifics of Sims's complaint the evidence does not support the finding on Question 15, Sims refers us to only two places of the reporter's record in his brief. According to Sims, the testimony he points us to established he was without authority to sign contracts for Huntsman. But even that argument does not explain why the jury could not have reasonably found Sims failed to fully disclose

---

[54] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).

[55] *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019) (cleaned up).

[56] *See Osterberg*, 12 S.W.3d 55.

his relationship with Titan before he approved daily timesheets that included Titan's time. Sims also fails to explain why the evidence showing he engaged in a practice of authorizing extra work and taking kickbacks is not evidence that supports the answer the jury provided to Question 15.

In his argument, Sims also suggests the scope of the turnaround was so large that Huntsman could not have possibly expected him to verify the time of all the contract employees who worked on the turnaround. But the evidence the jury heard allowed the jury to conclude that Sims knowingly approved the time of contract employees that he knew were doing extra work. And we must consider all the evidence in response to a party's insufficient evidence claim in conducting our review.[57] The evidence supporting the jury's answer to Question 15[58] includes testimony showing that

- Petty and Sims agreed Sims would use his influence at Huntsman to get someone to hire Titan to work on Huntsman's turnaround. Sims then received kickback payments from Titan for his recommendation when JV Industrial hired Titan for the turnaround. Sims, Titan's president, Petty, and Chad Murphree, an employee of Critical Path, testified to the facts supporting the answers the jury provided to the charge;

---

[57] *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (noting that a court reviews the evidence favoring and disfavoring the jury's finding when it conducts a sufficiency review).

[58] *Id.*

36

- During the turnaround, Sims failed to disclose material facts within his knowledge about his relationship with Titan to Huntsman. Testimony of a forensic accountant shows Huntsman paid JV Industrial, the entity that hired Titan, more than $2,000,000 in charges the accountant characterized as excessive, which he traced to Titan's bills. JV Industrial marked up Titan's invoices as its profit and Sims then passed JV Industrial timesheets on to Huntsman. The forensic accountant explained, for example, that Titan, through JV Industrial, billed Huntsman for Titan's overhead, employees who never worked on the turnaround, and charged twice for a time-management system Titan and JV Industrial never installed or used during the turnaround;[59]

- JV Industrial employees questioned Sims about the propriety of Titan's invoices. Under the circumstances shown by the evidence, the jury could have concluded that Sims knowingly participated with Titan in a scheme that involved using Titan to extract money from Huntsman for work that Titan did not earn. A former JV Industrial employee testified he asked Sims about Titan's billing practices. According to the employee, Sims told him "don't worry about who they charge." The same employee testified Sims instructed him to pay Titan's bills even though he questioned the bills because they included Petty's time. The employee explained he questioned Petty's billings because he never saw Petty do "a lick of work [on the turnaround]" at Huntsman's plant;

- A billing clerk who worked in Titan's billing department in 2014 testified he submitted invoices to JV Industrial for Titan's work. The billing clerk explained the construction industry considers payments made by a construction company to an individual employed by the company that hired the contractor to be a kickback in return for the recommendation that led to the work. He characterized the practice as "egregious[.]" The billing clerk also testified that, upon learning Titan was billing JV Industrial for Titan's administrative time, he asked Petty

---

[59] In Question 16, the jury awarded Huntsman only around $851,000 of the over $2,000,000 in economic damages that Huntsman's forensic accountant attributed the work Titan did on the turnaround.

about the practice. According to the billing clerk, Petty told him to bill the time; and

- Titan filed a 1099-MISC tax form with the IRS for tax year 2014 based on its payments to Sims in 2014. The tax form shows Titan paid Sims nearly $344,000 in 2014 under Sims's social security number. Sims disputed Petty's account when he testified, claiming Titan paid the money to his wife, Valerie, but Valerie testified Titan did not pay this money to her. Sims gave the jury no other reasonable explanation to account for the $344,000 in income he received from Titan in 2014. Sims's bank records reflect large deposits into his bank account, deposits consistent with the bank account records in evidence from Titan's bank.

Considering the evidence before the jury, we conclude it contains legally and factually sufficient evidence to support the jury's findings that Titan and Sims committed fraud.[60] To the extent Sims complains the evidence fails to support Question 15, his argument is overruled.

5. Sufficiency of the evidence, the joint enterprise finding

In another section of his second issue, Sims claims the evidence is legally and factually insufficient to support the jury's finding to Question 18. In Question 18, the jury found Sims and Petty "engaged in a joint enterprise in connection with their and [Titan's] involvement" in the turnaround. Because the jury answered "Yes" to Question 18, the joint enterprise question, the trial court signed a judgment holding

---

[60] *See City of Keller*, 168 S.W.3d at 827.

Sims and Petty jointly and severally liable for the damages of around $85,000 of the total judgment.

The joint and several liability finding in Question 18 hinges on the jury's answer to Questions 15 and 16. In Question 15, the jury found Petty and Titan committed fraud. In Question 16, the jury found Sims, Petty, Titan, and three others committed fraud in the transactions that involved Titan. In Question 16, the jury found $850,000 would compensate Huntsman for that fraud.

In his argument, Sims suggests a party seeking a joint-enterprise finding must prove four elements to recover on a claim alleging joint enterprise. He contends that as relevant to Question 18, the evidence before the jury is insufficient to prove just one of these four elements, whether he and Petty had an equal right to control Titan.[61] In his brief, Sims states: "Not a single exhibit nor witness ever explicitly states that Sims had equal authority over Titan as Petty while Sims worked for Huntsman." But Sims's bold claim is inaccurate, given the evidence in the record we have reviewed.

First, we note that Sims cites no cases to support his suggestion that a joint-enterprise finding hinges on direct evidence proving a joint enterprise exists.[62]

---

[61] *See St. Joseph Hosp.*, 94 S.W.3d at 530 (setting out the four elements defining the requirements needed to prove the existence of a joint enterprise).

[62] *See Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993) (observing circumstantial evidence may establish a fact when the testimony shows the jury,

Generally, the parties to a trial may use circumstantial evidence to establish facts, and often, circumstantial evidence without more is all the evidence needed to support the jury's finding on a claim.[63] Sims does not explain why the circumstantial evidence in the record about Sims's control of Titan's turnaround work is insufficient to support the jury's finding of equal control.

As is relevant here, Petty's testimony shows he consulted Sims on every major decision on the turnaround. Other evidence shows Petty thought Sims made more money from the manner the men were using Titan on the turnaround than Petty made, given that Sims had a greater role in concealing the enterprise from Huntsman and in the approval process relevant to Titan's work. The circumstantial evidence relevant to Sims's control over the enterprise shows the following:[64]

- In January 2015, less than two months after leaving Huntsman, and after Sims went to work for Titan,[65] Sims sent Petty an email demanding Petty openly recognize him as a co-owner of Titan's business;

---

acting reasonably, could have inferred the fact from the other facts admitted before the jury in the trial).

[63] *Id.*

[64] *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613-14 (explaining why circumstantial evidence supported the joint-enterprise finding under the circumstances there); *St. Joseph Hosp.*, 94 S.W.3d at 531 (explaining generally when circumstantial evidence supports a factfinder's finding).

[65] Sims testified that, in November 2014, Huntsman allowed him to resign to avoid being fired. Shortly after that, Sims took a job at Titan or a company related to Titan under Titan's corporate structure.

40

- In yet another email from Petty that same day, Petty told Sims to inform him of how much he had earned since they started the company;

- Shortly after that, Petty told Sims in an email "everything I've ever done here has been decided upon after consulting you[;]"

- A month later, in February 2015, Petty told Sims in an email "were supposed to be EQUAL partners, and I accepted that[;]" and

- Sims disputed the emails accurately represented his relationship with Petty when he testified. He testified Petty's representations about the nature of their relationship were inaccurate.

Here, the record contains evidence that allowed the jury to conclude Petty and Sims used Titan to further their common purpose, which was charging Huntsman for work that Titan did not earn. It was reasonable for the jury to reject Sims's testimony that he did not control the enterprise. There is evidence showing Sims enjoyed extensive control over the enterprise, control the jury could believe was equal to the control Petty retained.

We have now addressed each of the arguments Sims covered in his second issue. Finding the arguments either unpreserved or without merit, the issue is overruled.

C. Denial of Motion for New Trial

In issue three of his brief, Sims argues the trial court abused its discretion by refusing to grant his motion for new trial. According to Sims, the court should have

41

granted his motion. In his motion, Sims argued he was entitled to a new trial because the jury's answers to Question 2 (did Critical Path fail to comply with its contract— "Yes") and Question 4 (finding Huntsman should recover $0 for Critical Path's failure) are findings that conflict with the jury's answer to Question 5 (did Sims fail to comply with his fiduciary duty to Huntsman as to the transactions that involved Critical Path—"No") and Question 6 (awarding Huntsman nearly $167,000 in damages based on its finding in Question 5).

The record shows that none of the parties asked the trial court to send the jury back to the jury room to resolve any alleged conflicts in the jury's verdict before the jury was discharged. Instead, what the record shows is that Sims's attorney asked the trial court to accept the verdict after the trial court read the jury's verdict aloud. We conclude Sims failed to raise a timely complaint about the alleged conflicts in the jury's answers in the  trial court, which means Sims needed to point out the alleged conflicts in the answer to the trial court before it let the jury go.

Generally, parties must allow a trial court the opportunity to address whether a jury has returned a verdict that contains conflicting answers to the issues before the party may complain about the alleged conflict in its appeal.[66] But Sims waited to

---

[66] *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 516 & n.43 (Tex. 2018) ("[A] party waives any complaint regarding any alleged conflict in the jury's

42

raise the alleged conflict until he filed a post-verdict motion, and thereby waived his right to complain about any alleged conflict in his appeal.[67] Sims failed to preserve his issue three complaints for appellate review.[68] Issue three is overruled.

D. Evidentiary Rulings

In issue four of his brief, Sims argues the trial court erred when it refused his request to admit certain testimony and documents before the jury during the trial. Sims complains the evidence, which he contends the trial court excluded, would have allowed him to show that one witness who testified was biased for Huntsman because he wanted to help Huntsman prevail on its remaining claims. The witness, Chad Murphree, had been a party to the case but Huntsman settled with him on the morning before the trial began.

The attorneys discussed the settlement in court and outside the presence of any potential jurors just before conducting voir dire. In discussing the settlement, Sims told the trial court he would like to question Murphree about the settlement during the trial. Sims's attorney also explained he thought the fact Murphree settled showed Murphree was a biased witness. But Sims's attorney never identified any

_____

answers by failing to voice this complaint before the jury is discharged.") (cleaned up).

[67] *Id.*

[68] Tex. R. App. P. 33.1(a)(1) (to preserve error, a party must make a timely request, objection, or motion that stated the grounds for the ruling the party sought).

specific terms in the settlement to support his claim. Other than the very brief discussion the attorneys had with the trial court about the fact that Murphree settled, very little is in the record to show what the terms of the settlement were. Certainly, nothing in the record shows the settlement gave some type of incentive or obligation to assist Huntsman in prevailing on its remaining claims.

Instead, the statements from the attorneys about the settlement merely show how much Murphree agreed to pay to settle and that his settlement would be paid in two installments. The discussion before the trial mentions that should Murphree fail to make both payments, the terms of the settlement allowed Huntsman to take an agreed judgment against Murphree that would be several times greater than the amount Murphree would otherwise pay. The record shows Huntsman's attorney provided Sims's attorney with a copy of Murphree's settlement agreement, but it was not marked as an exhibit and Sims did not include it in any bill after the trial court told Sims's attorney it would not allow testimony about the settlement because Sims had not shown it would be relevant evidence to the issues the parties expected the jury to resolve.[69]

---

[69] Tex. R. Evid. 103(a)(2) (requiring a party, to preserve error when the trial court excludes evidence, to inform "the court of its substance by an offer of proof, unless the substance was apparent form the context").

In a separate complaint, Sims argues the court erred by preventing him from questioning Sims when Sims testified about whether Sims's conduct in taking kickbacks was like other "insider deals" Sims knew Huntsman tolerated from the employees who worked at the plant. But Sims also failed to make a bill to show what Sims would have said had he testified on this topic, so we cannot tell on this record what the testimony might have shown or whether it might have been relevant to any of the claims the jury resolved.[70]

Appellate courts review complaints about rulings excluding evidence using an abuse of discretion standard of review.[71] On appeal, the court reviewing the trial court's ruling must decide whether the error "probably caused the rendition of an improper judgment[.]"[72] Turning to the ruling on excluding the testimony about Murphree's settlement, we cannot say the fact Murphree and Huntsman settled gave Murphree any interest in Huntsman's remaining claims. Without a bill, Sims cannot show the testimony was even relevant to his claim that Murphree was biased in Huntsman's favor given whatever might be in the settlement's terms.[73]

---

[70] *Id.*

[71] *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018).

[72] Tex. R. App. P. 61.1(a); *see JBS Carriers*, 564 S.W.3d at 836.

[73] *See Gunn*, 554 S.W.3d at 666 (observing "a party must preserve error by filing an offer of proof informing the court of the substance of the excluded evidence"); *Garden Ridge, L.P. v. Clear Lake Ctr., L.P.*, 504 S.W.3d 428, 439 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (explaining that by failing to create a

Generally, evidence about the fact parties have settled claims is not relevant to any of the other claims in a trial.[74] Here, to preserve error, Sims's bill should have included a copy of the settlement agreement and the questions and Murphree's answers about the settlement. With a bill, we could determine whether the evidence was relevant and whether the trial court abused its discretion by excluding it in the trial. On this record, we cannot say the trial court abused its discretion by refusing to allow Murphree to be questioned about the settlement.[75] We reach the same conclusion on the evidence Sims wanted to offer about the circumstances of other employees involved in other insider deals.

We conclude Sims failed to file a bill of review to show what the evidence he wanted to offer would have shown.[76] Because the arguments Sims makes to support his fourth issue lack merit, the issue is overruled.[77]

---

record in the trial court to show what questions the attorney desired to ask and what the witness would have said, the appellant failed to make an offer of proof as required by the Rules of Evidence).

[74] Tex. R. Evid. 408 (directing trial courts to exclude evidence that a party promised or accepted valuable consideration in compromise of a claim when offered to prove or disprove the validity of the claim).

[75] *See Reliant Energy Servs., Inc. v. Cotton Valley Compression, LLC,* 336 S.W.3d 764, 793 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

[76] *See* Tex. R. Evid. 103(a)(2); Tex. R. App. P. 33.2.

[77] *Id.*

IV. Critical Path's Appeal

A. Damages

In its first issue, Critical Path complains about the jury's $167,000 damage award in Question 6 claiming it is logically inconsistent with the jury findings to Questions 4 and 13, where the jury found Critical Path's breach of contract (Question 4) and its fraud (Question 13) did not damage Huntsman. But Critical Path must pay the $167,000 damage award not because it breached its contract or because it defrauded Huntsman. It must pay the award because the jury found Critical Path knowingly participated with Sims in his breach of the fiduciary duty Sims owed Huntsman.

Critical Path's argument implies that the damages issues the jury answered to the fraud and breach of contract questions must relate to the damages the jury determined resulted from Sims's breach. For at least two reasons, Critical Path's argument is without merit.

First, Critical Path, like Sims, never pointed out any conflicts in the jury's verdict when the jury read its verdict aloud. By failing to do so, Critical Path failed to preserve its right to argue the answers created a conflict in its appeal.[78] But even had Critical Path preserved its right to argue the conflict in the form of a factual and

---

[78] *See* Tex. R. App. P. 33.1; *Menchaca*, 545 S.W.3d 516 & n.43.

legal sufficiency claim, the findings that Critical Path relies on to argue the answers conflict can be reconciled for the same reasons we explained in section III. B.2. above. When the jury found that Critical Path knowingly participated with Sims in his breach, Huntsman secured the finding it needed to have the trial court hold Critical Path jointly and severally liable with Sims for the $167,000 in damages the jury awarded to Huntsman in Question 6.[79]

In a separate issue one argument, Critical Path criticizes the trial court for adding prejudgment interest to the jury's $167,000 award. According to Critical Path, the trial court acted without authority when it added prejudgment interest to the award because Huntsman failed to plead a prejudgment interest claim. But Critical Path's argument about Huntsman's lack of pleading is without merit. Huntsman's live pleading alleges a claim for prejudgment interest.[80]

---

[79] *See* Tex. R. Civ. P. 300-302 (Rules of Procedure that address a trial court's obligation to render judgment); *Kinzbach*, 160 S.W.2d at 514 (common-law rule of joint and several liability applies to a knowing participant with a fiduciary in a breach); *Hunter Bldgs. & Mfg., L.P. v. MBI Global, LLC*, 436 S.W.3d 9, 15 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *Kinzbach*, 160 S.W.2d at 514) (noting that a third party who "knowingly participates in a defendant's breach of a fiduciary duty owed to a plaintiff . . . is jointly liable with the defendant for damages to the plaintiff proximately caused by this breach").

[80] While the request is in the Huntsman prayer in its Second Amended Counterclaim and Third-Party Petition, a party who requests prejudgment interest in its prayer has pleaded a prejudgment interest claim when the party complaining in the appeal did not file special exceptions to the pleading or obtain a ruling on such exceptions before the trial. *See Tull v. Tull*, 159 S.W.3d 758, 762 (Tex. App.—Dallas

Under Texas law, when authorized to do so either by statute or by common law, courts may award prejudgment interest on claims.[81] The evidence shows the award of $167,000 was based on the jury's determination that Huntsman suffered an economic loss when Sims failed to fulfill the fiduciary duty he owed Huntsman to exercise appropriate management control over Critical Path's work. The Texas Finance Code, the statute parties generally rely on when seeking prejudgment interest awards, makes prejudgment interest unavailable for claims based on nothing more than an economic loss unless that loss arises from a wrongful death, personal injury, or tangible property damages claim.[82] When the loss is merely economic and not based on a claim identified by the Finance Code, section 304.101 does not authorize adding prejudgment interest to the award at issue here, a strictly economic loss not covered by section 304.101.[83]

---

2005, no pet.) (explaining that "[a] general request for attorney's fees in the prayer of the pleading is itself sufficient to authorize the award of attorney's fees").

[81] *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (noting that statutes and general principals of equity are the authorities through which courts may decide to award prejudgment interest).

[82] Tex. Fin. Code Ann. § 304.101.

[83] *Johnson & Higgins*, 962 S.W.3d. at 530 (explaining the prejudgment interest statute applies to property loss claims but does not include an economic loss caused by an injury that did not involve the plaintiff's tangible property).

Trial courts, however, may add prejudgment interest on damages resulting from a fiduciary's breach when doing so is appropriate.[84] The $167,000 award is based on a fiduciary breach claim. In *ERI Consulting Engineers, Inc. v. Swinnea*, the Texas Supreme Court identified six factors for courts to use when considering whether to add common law prejudgment interest to a breach of fiduciary damages award.[85] When applied to the circumstances in this case, the factors outlined in *Swinnea* support the trial court's decision to add prejudgment interest to the jury's $167,000 award.

First, the evidence in the trial allowed the trial court to conclude Sims knew a conflict of interest existed when his job as turnaround manager required him to manage Critical Path's work. Second, Sims's failure to disclose the conflict deprived Huntsman of its right to consider whether to allow Sims to manage Critical Path's work. Here, Sims's management oversight included reviewing Critical Path's daily timesheets. The timesheets include charges Sims's conduct ended up requiring Huntsman to pay. Stated another way, Huntsman would not have paid some of the charges had Sims complied with the fiduciary duty he owed Huntsman. Third, Critical Path's owner, Cormier, was aware of the conflict. Cormier knew if

---

[84] *See Dernick Res., Inc. v. Wilstein*, 471 S.W.3d 468, 487 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

[85] *See Swinnea*, 318 S.W.3d at 875.

50

Huntsman knew that he and Sims co-owned Action Field Services, Huntsman would view the relationship as a conflict in deciding whether to put Sims in charge of its work. Sims's purchase of Cormier's shares in Action Field Services also benefitted Sims, a benefit the trial court could have viewed as the quid pro quo for Sims's recommendation and his willingness to overlook his duty to enforce Huntsman's contracts with Critical Path. Fourth, Critical Path, Cormier, and Sims all benefited from Sims's breach. Sims allowed Critical Path and Cormier to have significant roles in the turnaround they would not have enjoyed had the turnaround been managed by someone else. Fifth, Sims damaged Huntsman by approving timesheets containing time for extra work, work that included around $167,000 in work Huntsman never otherwise would have approved.

We conclude the trial court did not abuse its discretion by adding prejudgment interest to the $167,000 award. Critical Path's first issue is overruled.

B. The knowing participation finding in Question 7

In issues two through four, Critical Path contends the trial court should not have held it jointly and severally liable with Sims because Huntsman failed to submit all the elements required to support the jury's finding in Question 7. In Question 7, the jury found Critical Path knowingly participated in Sims's breach. According to Critical Path, Huntsman should have asked the jury for three more findings to justify

the trial court's decision to hold it jointly liable for the $167,000 award. It claims Huntsman needed (1) a finding Critical Path intended to injure Huntsman,[86] (2) a finding that Critical Path assisted and encouraged Sims to breach the fiduciary duty it found he owed Huntsman,[87] and (3) a finding that Critical Path's conduct was a substantial factor in causing the damages resulting from Sims's breach.[88]

According to Critical Path, these three findings are necessary findings to support Huntsman's aiding and abetting claim. But Huntsman did not submit an aiding and abetting claim to the jury. Aiding and abetting claims have never been "expressly recognized" as being viable by the Texas Supreme Court.[89] Instead, Huntsman submitted a knowing participation claim, a claim that is recognized by the Texas Supreme Court.[90]

The cluster of issues Huntsman submitted on its breach of fiduciary duty and damages claim together with the knowing participation finding in Question 7 were

---

[86] This is the basis of the argument Critical Path makes in its second issue.

[87] This is the basis of the argument Critical Path makes in its third issue.

[88] This is the basis of the argument Critical Path makes in its fourth issue.

[89] *Parker*, 514 S.W.3d at 224; *see also* RESTATEMENT (SECOND) OF TORTS § 876 (AM. LAW INST. 1977).

[90] *See Kinzbach*, 160 S.W.2d at 514 (discussing the elements of a knowing participation claim); *see also Hunter Bldgs. & Mfg.*, 436 S.W.3d at 15 (applying *Kinzbach*'s joint liability rule to a fiduciary duty claim); *Darocy v. Abildtrup*, 345 S.W.3d 129, 137 (Tex. App.—Dallas 2011, no pet.) (same); *DeYoung v. Beirne, Maynard & Parsons, L.L.P.*, No. 01-13-00365-CV, 2014 Tex. App. LEXIS 2965, at *15 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (same).

all Huntsman needed to support a judgment holding Critical Path jointly and severally liable with Sims for the damages Sims caused by his breach, as his breach relates to the transactions that involved Critical Path.[91] We conclude the arguments Critical Path raises to support its last three issues, like the arguments supporting its first, lack merit. For that reason, Critical Path's issues are overruled.

## V. Conclusion

We conclude the appellants' arguments are either without merit or they did not preserve the arguments they have made in the appeal for the purpose of appellate review. For the reasons explained above, the trial court's judgment is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on July 1, 2019
Opinion Delivered March 19, 2020

Before McKeithen, C.J., Kreger and Horton, JJ.

---

[91] *Id.*